The Decorah Woolen Mill Co. v. Greer.

---

THE DECORAH WOOLEN MILL CO. v. GREER ET AL.

1. **Easement:** CONVEYANCE. A right of easement which has never been exercised so as to become actually appurtenant to land, and which is not essential to its use and enjoyment, will not pass by a conveyance of the land without an express grant of the easement.

2. ——: CONSENT: MILL-RACE. When consent is given to the use of land for the construction of a mill-race, the use, from its nature, must be regarded as permanent; and where money is expended upon the strength of the consent an easement is created which is irrevocable, and may be transferred in connection with the estate to which it is appurtenant.

3. ——: AGENT: ESTOPPEL. The owner of land over which it is claimed an easement has been granted by an agent of the owner, is not estopped to deny the authority of the agent to grant the easement by improvements made by the grantee, unless the owner of the land had actual knowledge that the improvements were being made.

4. **Water-Power:** MEASURE OF DAMAGES. In an action for damages by the owner of a mill against a party who has injured his water-power and impaired the operation of his mill by the construction of a dam on the stream below, the measure of damages is not the loss caused by the entire stoppage of the mill, but only such loss as cannot be prevented by the use of other appliances.

*Appeal from Winneshiek District Court.*

FRIDAY, OCTOBER 25.

THE plaintiff is the owner of a woolen mill upon the Upper

Iowa river at the city of Decorah. The motive power of the mill is furnished by the river. East of and below the mill the defendants Greer and Hunter have erected a dam across the river, and the back flowage of the water caused by the erection of the dam has impaired the water-power heretofore enjoyed by the plaintiff. From the plaintiff's wheel-pit the water is taken by a race and is carried into a creek called Spring Branch, which flows into the river. The creek has been widened and deepened, and is made a part of the race. The defendants' dam has caused the water to set back in the race. The plaintiff avers that a dam exceeding eighteen inches in height cannot be maintained where the defendants' dam is without such result, and that the defendants have no right to maintain a dam of greater height than eighteen inches. The plaintiff prays that all the defendants' dam above eighteen inches be abated and removed, and prays judgment for damages.

The intervenor, Charles Golz, claims to be the owner of a part of the land occupied by the plaintiff's race; that the plaintiff's occupation is without right, and he prays that the plaintiff be decreed to vacate the premises. Other facts are stated in the opinion. The court dismissed the plaintiff's petition, and rendered a decree in favor of the defendants and the intervenor. The plaintiff appeals.

*Willett & Willett* and *L. O. Hatch*, for appellant.

*Levi Bullis* and *E. E Cooley*, for appellees.

ADAMS, J.—I. The plaintiff's mill is erected upon the south side of the river, and is on the north-west quarter of

1. EASEMENT: conveyance.

the south-east quarter of section 16. The water taken from the plaintiff's wheel-pit is returned to the river upon the south-east quarter of the north-east quarter of the same section. The latter tract was formerly owned by one William Day. Not far from the mouth of Spring Branch, and between it and the river, and extending from one

The Decorah Woolen Mill Co. v. Greer.

to the other, is a small tract known as the Kennedy tract, This tract is carved out of the south-east quarter of the north-east quarter of section 16, formerly belonging to Day, and was after his death sold by his executor to Kennedy, through whom the title has been acquired by the plaintiff. As appurtenant to this tract there was also conveyed the water-power on the river north and west. The plaintiff has also acquired other tracts of land upon the river between the Kennedy tract and its mill, and by reason of the various purchases has become the owner of the water-power to a point in the river as far east as the most easterly point of the Kennedy tract, unless its right is subject to a prior right belonging to the defendants. Whether the defendants have such prior right is a material question in the case. Their claim is based upon the following facts: They are the owners of a tract upon the river still further east, on section 15, which tract is known as the Otis purchase. Section 15 was formerly owned by William Day, and the tract called the Otis purchase was conveyed by him to Otis with the privilege of damming the river at the upper line of the land to the height of five feet, provided the water should not flow over the land in section 16. This conveyance to Otis was made before the conveyance of the Kennedy tract to Kennedy. The defendants have now acquired it, and claim the right of back flowage provided in the deed to Otis; and they maintain that they are only exercising such right, and that whatever right the plaintiff has is of subsequent date and is subject to it.

It appears, however, that the provision in regard to damming the river contained in the deed to Otis is not contained in the deed to the defendants. It appears, also, that prior to the conveyance to Kennedy by Day's executor the right to dam the river, as granted by Day to Otis, had never been exercised. Now, while the rule is that an easement appurtenant to land will pass by a conveyance of the land, without an express grant of the easement (*Kent v. Waite*, 10 Pick., 138; *Karmuller v. Krotz*, 18 Iowa, 352), yet the easement in such

case must be actually appurtenant; that is, it must be practically annexed to the granted premises. Whether in a given case it should be so regarded depends, as said by PECK, J., in *Perrin v. Garfield*, 37 Vt., 312, upon the nature, character and purpose of the easement, its relation to the subject-matter of the grant, its accustomed use in connection with it, and its necessity to the value and to the beneficial use of the premises. In that case the question was whether the conveyance of a mill carried with it, by implication, the water-power as an appurtenance. It was held that it did, on the ground that there was a necessary connection between the mill and the stream. In *Philbrick v. Ewing*, 97 Mass., 134, HOAR, J., said: "An easement, where it is not expressly described in the conveyance, must actually belong to the estate conveyed in order to pass by implication. The rule is commonly stated to be that the grantor conveys by his deed, as an appurtenance, whatever he has power to grant, which is practically annexed to the granted premises at the time of the grant, and is necessary to their enjoyment in the condition of the estate at that time." In Washburne on Easements, chap. 1, § 3, the author says: "In order to have a right of easement in or over one piece of land passed by the grant of another parcel, it must be an existing easement, actually appurtenant by use and enjoyment, and by having been exercised with the occupation of the latter parcel. It is not enough that the grantor, when he made his deed, had a right, in the nature of an incorporeal hereditament, to an easement in the other land which he had never exercised or applied." See, also, *Brace v. Yale*, 4 Allen, 393.

At the time of the conveyance to the defendants it cannot be said the easement in question had been practically annexed to the granted premises. Neither mill nor dam had been erected. The easement had been simply annexed on paper, to-wit: in the deed to Otis. It did not, then, we think, pass by implication, and it follows that the right acquired by the

plaintiff to the water-power north and west of the Kennedy tract is not subject to any rights of the defendants therein.

There remains to be considered in this connection whether the plaintiff has acquired the right to the water-power in that part of the river between the Kennedy grant and the mouth of the plaintiff's race, to-wit: the mouth of Spring Branch. This was originally owned, as we have seen, by William Day. Upon his death the property passed, as it appears, to Elizabeth, John and Richard Day, and remained in them until after the construction of the plaintiff's mill and race. The original proprietor of the mill and race was the Winneshiek Manufacturing Association, and the plaintiff claims that a license was granted to that company to construct the race in that portion of the creek in question by Elizabeth, John and Richard Day. Upon this point the plaintiff relies upon the testimony of one Oleson, who was the agent of the association at the time the mill and race were made. He says: "The company knew at the time they dug this tail-race to whom the several pieces of land belonged crossed by their tail-race. I remember of going round and seeing the parties who owned the lots at that time. I got their consent to run across." John Day, on the other hand, testifies that he never heard anything about it. But his further examination leads us to conclude that he might have given his consent and forgotten it. Besides, Oleson is at least slightly corroborated by the circumstances. The company was about to build a mill at a cost, as it appears, of over fifty thousand dollars, and to expend twelve hundred dollars in the construction of a race. It seems incredible that the company would have proceeded without supposing that they had obtained the consent of the owners of the lots that were to be crossed by the race. Again, the race was constructed in 1867, and was maintained for eight years without objection. Indeed, no objection appears to have been made at any time by the Days.

After the commencement of this action the defendants

*2. ——: consent: mill-race.*

purchased of them a few square rods of land at the mouth of the creek, with the evident purpose of fortifying their claim, and the first objection to the use of the creek comes from them.    In our opinion it must be considered as proven that the Winneshiek Manufacturing Association did obtain the consent of the Days to the use of the creek.

It is insisted, however, by the defendants that the association acquired at most a mere license, and that it was not assignable to the plaintiff, and was revoked by a conveyance by the licensors ; but such we think is not the law.    Where consent is given to the use of land for the construction of a mill-race, the use from its nature must be regarded as designed to be permanent ;   and where money is expended.upon the strength of the consent, an easement is created which is irrevocable, and may be transferred in connection with the estate to which it is appurtenant.    See *Cook v. The C., B. & Q. R. Co.*, 40 Iowa, 451, and cases cited; also *Cook v. Predgen*, 45 Georgia, 331. The grant of the right to use the creek for a race carried with it the right to use the water-power included in the fall of the river to a point as low as the mouth of the creek.

II.    The intervenor, Charles Golz, is the owner of a lot crossed by the race, and he claims that no consent was ever given in respect to that lot.    It is shown clearly enough that the Winneshiek Manufacturing Association made an effort to obtain consent, but the evidence does not satisfy us that they succeeded.    The lot was owned by one Walker, a non-resident of Iowa, who had an agent, one Cameron, residing at Decorah.    Cameron, we think, consented to the construction of the race across the lot, but there is no evidence that he had any authority to give such consent. It is shown, it is true, that the lot was once· redeemed for Walker from a tax sale at Cameron's request; but authority to redeem the lot from tax sale, or to procure it redeemed, would certainly not include the authority to sell it.    For the same reason, we think, it would not include authority to grant any interest in it.

3. ——: agent: estoppel.

The validity, then, of Cameron's consent must depend upon whether it was ratified. The plaintiff contends that it was. The evidence upon which the plaintiff relies is the testimony of Oleson. He says that after the race was completed Walker saw it and made no objection. It does not appear, however, that he knew that Cameron had given any consent to its construction, and in the absence of such knowledge we do not think that Walker's silence can be construed as a ratification.

The plaintiff further contends that Walker was estopped by silence from disputing the right in the lot claimed by the association, and that the estoppel applies to his grantee. To this we think it may be said that to estop Walker it should appear that he saw the association spending money under a claim of right, and the evidence fails to show that he did. The race, it appears, was completed when he first saw it. The claim of the intervenor, then, the present owner of the Walker lot, we think, must be sustained. But this does not affect any rights which the plaintiff may have acquired from others, except to preclude it from the exercise of the right until it may have acquired a right to maintain its race through the Walker lot or elsewhere.

III. The fact that the plaintiff has not acquired a valid right in the Walker lot should not, we think, affect its right 4. ———: water to damages. It is enough that the plaintiff was power; meas- ure of damages in the undisturbed possession and enjoyment of the race at the time of the injuries complained of. If a railroad company fails to obtain a right of way to a certain tract crossed by its road, it does not follow that a person may with impunity obstruct its trains anywhere upon the line of the road. That the plaintiff is entitled to damages seems clear. The amount it is more difficult to determine. The plaintiff claims that it has shown itself entitled to over six thousand dollars. It introduced evidence tending to show that after the mill was obstructed by back flowage from the defendant's dam it was able to do only about one-fourth as much work

as before; that the full capacity of the mill was about twelve hundred yards per month, and that the profits per yard were five cents. For the loss of profits thus shown the plaintiff claims the right to recover.

To this mode of estimating damages we think there are insuperable objections. Because a water-power is obstructed it does not follow that a mill run thereby should be allowed to stand idle or do only a fourth of its ordinary work. In such case it is the duty of the mill owner to supply other power if the mill can be run at enough profit to justify it. Where a person sustains an injury from a wrong-doer it is the duty of the person to make a reasonable effort to limit the effects of the injury. *Douglass v. Stevens*, 18 Mo., 362; *Illinois Central R. Co. v. Finnigan*, 21 Ill., 646; *Loker v. Damon*, 17 Pick., 284. And this is so even though it may be necessary for the injured person to expend money for such purpose. *Thompson v. Shattuck*, 2 Met., 615. Water-power can be supplemented or substituted by steam-power. This is often done. This was done by the plaintiff, but not until after it had run its mill for several months at one-fourth of its full capacity. There may, to be sure, have been some good reason for not employing steam-power sooner, but none is shown, and we conclude that there was not. The question, then, is as to how much it would have cost to furnish steam-power to manufacture all the goods which the evidence shows could have been manufactured at a profit. While steam-power was furnished it cost, as appears, about one hundred and fifty dollars per month, including interest on the cost of the engine, but excluding wear and depreciation, as to which there is no evidence. The mill was obstructed from October, 1874, about seven months prior to the commencement of the action. During that time the mill was run about five months, and at about one-fourth of its ordinary capacity. Its operation was suspended two months in the winter. Why it was suspended does not appear, except that it is shown that it is the custom of woolen mills to suspend in the winter. With the engine the mill could have been run

at its full capacity during the five months at an extra expense of about eight hundred dollars. We should be inclined to think that the plaintiff would be entitled to recover that sum, if the evidence showed that the mill could have been run at a profit at its full capacity during that time. But on this point the evidence is singularly deficient. So far as we can see the market in which there was a profit was limited to orders received from country merchants, without expense of solicitation. Whether a profit could have been made by sales in the general market—that is, by soliciting orders from country merchants, or selling in Chicago or other great commercial centers where the demand may be supposed to be indefinitely large—we are unable to determine.

But the evidence shows that the rates in Chicago were not the same as in the sales to country merchants, upon which alone profits are calculated. Whether the market furnished by orders from country merchants was large enough to justify running the mill continuously at its full capacity is not shown. Certain it is, it had not been so run prior to the time when it was obstructed. After the engine was put in it was run but two months. At the time of taking the testimony, months afterward, work had not been resumed. With the engine, all the goods that were manufactured after the mill was obstructed, and before the commencement of the action, could have been manufactured in about a month and a quarter, and the extra expense caused by the use of the engine would have been about two hundred dollars. It is true, the evidence shows that more goods could have been sold at a profit, but it does not show how much more. It gives us quite too large a field for conjecture. We have concluded, however, as the plaintiff's damages appear to exceed two hundred dollars, but not eight hundred dollars, to allow five hundred dollars. For that sum the plaintiff may take a decree.

The plaintiff is also entitled, according to our ruling, to a decree that the defendants' dam be so far abated as not to interfere with the power which the plaintiff has heretofore enjoyed,

to-wit: to the fall in the river as low as the mouth of Spring Branch. Precisely how far the dam should be abated in feet and inches we are not able to determine, nor do we deem it necessary. It can be practically determined when the decree is carried into effect.

Upon the appeal as against the intervenor the decree of the District Court is affirmed, and upon the appeal as against the defendants it is

· REVERSED.