MATTIE R. WILLIS v. THE CITY OF PERRY, Appellant.

**Damages:** SUBTERRANEAN STREAM. No one of several owners of wells tapping a subterranean stream can so use its water for artificial purposes (as a city supplying it to its inhabitants), as to deprive the other, at times, of the ability to use it for artificial purposes.

MEASURE: PAST PROFITS of a bath house are admissible to bear on rental value, and as an aid in fixing damages in an action for depriving owner of water.

SAME. Such wrongdoer is liable for the *value* of the appliances used by plaintiff to lessen her injury, and not merely for the value of their *use*, when it does not appear that they added to the value of plaintiff's property, or had any value after her use of them was at an end.

MITIGATION. That the city offered the use of its water free, does not affect its liability when it does not appear what outlay to plaintiff, in making connection, such use would have involved.

**Instruction.** It is held, that, taking an instruction together, the use of "diminished use" in place of "diminution of the use," was without prejudice.

SAME. The effect of an act may be submitted though it be not disputed that it had effect, when the evidence tends to show also that it was not a material effect.

**Plea and Proof.** Contributory negligence must be pleaded, and that it worked injury, proven.

*Appeal from Dallas District Court.*—HON. J. H. HENDERSON, Judge.

MONDAY, OCTOBER 22, 1894.

ACTION for damages caused by diverting water from a flowing well. Verdict and judgment for plaintiff. Defendant appeals.—*Affirmed.*

*Shortley & Harpel* for appellant.

*White & Clark* for appellee.

KINNE, J.—The undisputed facts in this case are that, in 1888, plaintiff sunk a well on her lot in the city of Perry, Iowa, and secured a flow of water therefrom, which rose to a height of several feet above the surface of the ground. She erected a bath house, and piped the water from the well into said house and the bath tubs therein, and built up a large and profitable business. In 1890 one Blank sunk a well on his ground, near to plaintiff's well; and, very soon after, one Burrington sunk a well on his land near plaintiff's well. Both the Blank and Burrington wells were situated on ground considerably lower than was plaintiff's. Prior to the sinking of these last two wells, plaintiff had put a "goose neck" on her well, about three feet or three and one half feet high, and the water was discharged therefrom with great force and constantly. After the Blank and Burrington wells were sunk and had commenced to flow, the stream from plaintiff's well was lighter, and it would only raise three feet high. Plaintiff then lowered the goose neck so that it was about two feet high. In 1891 defendant city, for the purpose of supplying water to its citizens, sunk three wells on its grounds about a block from plaintiff's well. They were all four inches in diameter, and a flow of water was secured from each of them. In the fall of 1891 the city erected works and pumping machinery, and attached the same to said wells, and pumped from them such quantities of water as were needed for the city supply. After the city wells began flowing, and when they were left open, the water in plaintiff's well ceased to flow, and the water seems to have stood therein at about the level of the ground. When caps were put on the city wells, plaintiff's well would flow. The city wells were

on lower ground than plaintiff's well. After the city attached its pumping machinery to its wells, and when it was pumping, there would be no flow at all from plaintiff's well, and this condition of affairs continued to exist for some length of time after the city ceased pumping. Sometimes, after the city had been pumping, it would be two or three hours, and at other times five or six hours, before the flow of water from plaintiff's well would begin. At times, when the city was not pumping, the caps would be removed from its wells, which would release the water, and permit it to flow and waste, and during these periods there was no flow from plaintiff's well. The Blank and Burrington wells appear to have been flowing most of the time, whether in use or not. Plaintiff's well was permitted to flow when it would, and the water wasted into the creek. Prior to the sinking of the city wells, plaintiff had used the water from her well for domestic purposes, and for giving baths in her bath house, and had sold some of the water. She had also used it in washing for her bath house. At first the water was carried in buckets to the bath house, but afterward it was forced by steam and mechanical appliances from the well into tanks in the bath house. These appliances are thus described by a witness: "The first siphon was used to raise the water to the tanks for heating. The siphon was attached to the pipe about two feet above the surface of the ground, and then there was a horizontal pipe about ten feet long running from it to the well, and which was lowered about a foot or a foot and a half after the city wells were put in. Steam was conducted from the boiler through a pipe into the siphon, and then the water was forced out into the tank and distributed." There is a conflict in the testimony as to what efforts plaintiff made to secure water from her well after the city wells were sunk and being operated; but we think it fairly appears that she put in a larger boiler, and

made certain other changes in the machinery, and she claims that she could not draw the water when the city was pumping, and that by reason of the sinking of the wells by the city, and its permitting them to flow, and by pumping water from them, she was deprived of water, for all purposes, for over half of the time. The defendant claims that plaintiff, with her machinery and appliances, if properly operated, could at all times have supplied herself from her well with an abundance of water for all purposes. Plaintiff claims special damages in the sum of one hundred and sixteen dollars and fifty-five cents, expended in order to save herself from damages by reason of defendant's acts. Defendant denies that it diverted the water from plaintiff's well, and avers that in all respects it, in sinking its wells and in using them, exercised prudent care and caution to the end that the water should not be wasted, and that it used only so much of said water as was necessary to supply the demands and needs of said city; denies that its use of the water interfered with plaintiff's use of her bath house, or, if it did so, it was only for one or two hours each day, and while the defendant was pumping water from its wells into its stand pipe; that there is at all times in the subterranean stream ample and sufficient water to supply all the wants of plaintiff. A jury trial was had, and a verdict rendered for plaintiff for four hundred and seventy-five dollars, and judgment was entered thereon, from which defendant appeals.

II. While, in the issues as made, the question as to these wells being all supplied from the same subterranean stream is in controversy, still the cause was tried upon the theory that all of these flowing wells were in fact supplied from one and the same subterranean steam, and, indeed, so far as appears from the record, it would seem that the indications all tend to sustain that theory. In deciding the questions presented, we must determine by what rule of law the rights of

the parties to this unseen stream of water are to be measured. Subterranean water courses are of two classes: *First*, those whose channels are known or defined; and, *second*, those whose channels are unknown and undefined,—and the principles of law governing the former are not applicable to the latter. Kin. Irr., sec. 48. If, in fact, or by reasonable inference, it is known that a subterranean stream of water flows in a well defined channel, capable of being distinctly traced, it is said to be governed by the rules of law applicable to streams flowing upon the surface of the earth. Such is the general rule, to which, however, we think there are some exceptions, which will hereafter be considered. *Burroughs v. Saterlee*, 67 Iowa, 400, 25 N. W. Rep. 808; Kin. Irr., sec. 48; Black's Pom. Water Rights, sec. 67; Gould, Waters, sec. 281; Washb., Easem., p. 516; Ang., Watercourses, sec. 112; *Dickinson v. Canal Co.*, 7 Exch. 282; *Chasemore v. Richards*, 2 Hurl. & N. 186; *Cole Silver Min. Co. v. Virginia & Gold Hill Water Co.*, 1 Sawy. 470, Fed. Cas. No. 2,989; *Smith v. Adams*, 6 Paige, 435; *Mason v. Cotton*, 4 Fed. 792; *Trustees, etc., v. Youmans*, 50 Barb. 320; *Wheatley v. Baugh*, 25 Pa. St. 531; *Dundee v. Guardians, etc.*, 1 Hurl. & N. 627; *Frazier v. Brown*, 12 Ohio St. 300; *Hanson v. McCue*, 42 Cal. 303; *Strait v. Brown*, 16 Nev. 321; *Whetstone v. Bowser*, 29 Pa. St. 59; *Saddler v. Lee*, 66 Ga. 45; *Acton v. Blundell*, 12 Mess. & W. 324; *Haldeman v. Bruckhart*, 45 Pa. St. 514; *Hale v. McLea*, 53 Cal. 578. The general rule governing surface streams is that "*prima facie* every proprietor on each bank of a river is entitled to the land covered with the water to the middle of the thread of the stream, or, as is commonly expressed, '*usque ad filum aquae.*' In virtue of this ownership, he has a right to the use of the water flowing over it, in its natural current, without diminution or abstraction; but strictly speaking, he has no property in the water itself,

but a simple use of it as it passes along." *Tyler v. Wilkinson*, 4 Mason, 400, Fed. Cas. No. 14,312; Kin. Irr., sec. 59, and cases cited. In other words, every riparian owner has a right to use the water in the stream as it passes along, and an equal right with those above and below him to the natural flow of the water in its accustomed channel, without unreasonable detention, or substantial diminution, either in quality or quantity, and none of such owners have the right to use the water to the prejudice of the others, unless such a right has been acquired by license, grant, or prescription. Kin. Irr., sec. 60; Gould, Waters, secs. 213, 214; Ang. Watercourses, sec. 93; *Heath v. Williams*, 25 Me. 209, 43 Am. Dec. 275, and notes; *Garwood v. Railroad Co.*, 83 N. Y. 405; *Ware v. Allen*, 140 Mass. 513, 5 N. E. Rep. 629, and notes; *Railroad Co. v. Miller*, 112 Pa. St. 34, 3 Atl. Rep. 780, and note; Gould, Waters, sec. 204; 3 Kent, Comm. 439; *Blanchard v. Baker*, 8 Greenl. 266; *Bealey v. Shaw*, 6 East, 208, 214; *Pope v. Kinman*, 54 Cal. 3; *Plumleigh v. Dawson*, 1 Gilman, 544; *Wheatley v. Chrisman*, 24 Pa. St. 302; *Weiss v. Steel Co.*, 13 Or. 496, 11 Pac. Rep. 255.

Now, each riparian owner has a right to use the water of a surface stream for ordinary or natural uses, and, under certain circumstances, for artificial uses, such as for irrigation and the like; and the better law seems to be that he may use the water for his natural and ordinary wants, regardless of the effect upon other proprietors on the stream; that is, as we understand the rule, one riparian proprietor may, for his natural wants, if necessary, use all of the water in a surface stream, to the exclusion of every other such proprietor, certainly so as against the other proprietor using the water for artificial purposes. Pom. Rip. Rights, sec. 125; *Spence v. McDonough*, 77 Iowa, 462, 42 N. W. Rep. 371; Kin. Irr., secs. 65, 66; Gould, Waters, sec. 205; Ang. Watercourses, sec. 93; *Stanford v. Felt*,

71 Cal. 249, 16 Pac. Rep. 900. In case, however, such a proprietor puts the water to an extraordinary or artificial use, he must do so in such a manner as not to interfere with its lawful use by others above or below him upon the same stream. Kin. Irr., sec. 65; Ang. Watercourses, sec. 93. As to extraordinary or artificial uses, the rights of all proprietors on the stream are equal (Gould, Waters, sec. 206, and cases cited; *Dumont v. Kellogg*, 29 Mich. 422); and the artificial use is held to be always subordinate to the natural use. If there is not water enough to more than supply the natural wants of the several riparian owners, none can use the water from the stream for artificial purposes. Ordinary or natural uses have been held to include the use for domestic purposes, including household purposes, such as cleansing, washing, and supplying an ordinary number of horses or stock with water, and it is said that natural uses are limited to the purposes above stated. Kin. Irr., sec. 66, and cases cited; Black, Pom. Rip. Rights, sec. 138, and citations; Gould, Waters, sec. 205; Ang. Watercourses, sec. 93; *Garwood v. Railroad Co.*, 83 N. Y. 405; *Stanford v. Felt*, 71 Cal. 250, 16 Pac. Rep. 900. Now, what is a reasonable use of the water of a surface stream for artificial purposes? Clearly, such a use as permits the return of the water used to the stream in its natural channel, without corruption or sensible diminution in quantity. By this is not meant that all the water must be returned to the stream, because in the use some will necessarily be lost or wasted. What is or constitutes such reasonable use must be determined in view of the size and capacity of the stream, the wants of all other proprietors, the fall of the water, the character of the soil, the number of proprietors to be supplied, and all other circumstances. In no case, however, is reasonable use to be determined in view of the necessities or business of any one proprietor, but the rights of each

in the stream for artificial uses are to be determined in
view of all of the circumstances as affecting all of the
proprietors. Kin. Irr., sec. 76, and cases cited;
*Jones v. Adams,* 19 Nev. 78, 6 Pac. Rep. 442; *Para
Rubber-Shoe Co. v. City of Boston,* 139 Mass. 155, 29
N. E. Rep. 544. As one who uses water from a well
supplied from a subterranean stream can not return to
such stream the water he may use, or any part of it, it
follows that the rules of law governing the use of water
from surface streams can not in all respects be said to
control in a case like that at bar. As to a surface
stream, the riparian owner may use the entire stream
for extraordinary purposes, provided he seasonably,
and without sensibly diminishing its volume or impair-
ing its quality, returns it to its accustomed channel.
But in this case he could have no such right, else he
might for artificial purposes exhaust the entire stream,
to the detriment of other well owners situated thereon,
and who would be entitled to the use of the water for
domestic purposes, as against any artificial use.

It seems to be conceded that the use of the water
by the city was an unusual and extraordinary use; that
it was not what is spoken of in the books as a natural
use, for, if it was, then the city would, under the
authorities cited, be entitled to use all of the water if
it needed it. Was not plaintiff's use of the water an
extraordinary and artificial use, in so far as she used
the same for the purpose of operating her bath house
and steam washer for washing bath towels? We
think it was. If such a use can be treated as a natural
use, as for domestic purposes only, then she might
thus exhaust the entire stream, to the damage of all
others having the right to use it even for natural uses.
Just what is or is not an artificial use can not be defined
so as to cover all cases that may arise, but it is not easy
to discern the difference in principle between the use
of water for manufacturing purposes, which is usually

held to be an artificial use, and its use for operating a bath house. Neither use is for domestic purposes, as ordinarily understood. Applying the law to the facts of this case, we think it is clear that, for any damage done by defendant to plaintiff in depriving her of the free and accustomed use of the water in her well for the usual domestic purposes, the city would be liable, because, in any event, its use of the water was for extraordinary and artificial purposes.

Whether defendant would be liable for using its wells in the supplying of water to the inhabitants of the city, thereby at times interfering with plaintiff's supply of water for the purpose of operating her bath house, depends upon the reasonableness of defendant's use of its wells. As to this, we have already seen that the reasonableness of the use is not to be measured by the wants or necessities of the defendant, but it is to be determined in view of all the facts and circumstances, and in view of the number and wants of other well owners on the stream. It does not appear that there are any wells tapping this subterranean stream other than those heretofore mentioned; nor does it appear with any degree of certainty as to what were the wants or needs of the owners of the Blank and Burrington wells. It appears that defendant pumped from its wells from two hundred to one thousand gallons of water each day, and that when the pumping was going on, and for several hours afterward, no water flowed from plaintiff's well. As near as can be ascertained from the evidence, plaintiff required about as much water for her bath house as the city was using. The city's plant was new. It had as yet but few consumers for water. Each party, for artificial purposes, had an equal right to use the water, and each was bound to so exercise that right as to cause the other the least inconvenience and damage. From the nature of the case, neither of

the parties being able to return the water to the stream from whence it came, the reasonableness of the use is to be determined in view of that as well as other facts. Both having an equal right to the water for artificial uses, neither could so exercise that right as to wholly deprive the other of its use at any time. We think the evidence shows that the city not only deprived the plaintiff of the use of her well for domestic purposes for much of the time, but it also deprived her entirely of its use for a portion of the time, for her bath house.

III. Plaintiff and her husband, as witnesses on the stand, were permitted, against defendant's objection, to testify as to the profits made from the bath business. Other witnesses, also, against defendant's objections, testified to the use and extent of the patronage of the bath house. It is said that evidence of profits is too remote, is speculative, and not the proper measure of damages. Doubtless, in such a case, the rental value of the bath house for the time plaintiff was deprived of its use by defendant's acts would be the measure of her damages. But how is rental value to be shown in such a case if not from the character and extent of the use of the building? In Sutherland on Damages (volume 1, section 70) it is said: "The law, however, does not require impossibilities, and can not therefore demand a higher degree of certainty than the nature of the case admits. If a regular and established business is wrongfully interrupted, the damages thereto can be shown by proving the usual profits for a reasonable time anterior to the wrong complained of." In *Wolcott v. Mount*, 39 N. J. Law, 262, it is said that the earlier cases, "both English and American courts concur in excluding, as well in actions in tort as in actions on contracts, from the damages recoverable, profits which might have been realized if the injury had not been done or the contract had been performed. This abridgment of

the power of courts to award compensation adequate to the injury suffered has been removed in actions of tort. The wrongdoer must answer in damages for those results, injurious to other parties, which are presumed to have been within his contemplation when the wrong was done."

This rule is well supported by the authorities. *Gibson v. Fischer*, 68 Iowa, 31, 25 N. W. Rep. 914; Sedg. Dam., p. 80, note 1; *Hamer v. Knowles*, 30 L. J. Exch. 102; *Bridge v. Fisk*, 23 N. H. 171; *Chandler v. Allison*, 10 Mich. 460; Wood, Nuis. 892; *Dubois v. Glaub*, 52 Pa. St. 238; *Fultz v. Wycoff*, 25 Ind. 321; *Park v. Railroad Co.*, 43 Iowa, 636; *Simmons v. Brown*, 5 R. I. 299; *White v. Mosely*, 8 Pick. 356; *Gladfelter v. Walker*, 40 Mich. 3; *Goebel v. Hough*, 26 Minn. 252, 2 N. W. Rep. 847; *City of Terre Haute v. Hudnut*, 112 Ind. 542, 13 N. E. Rep. 686; *Holden v. Lake Co.*, 53 N. H. 552. In the case of *City of Terre Haute v. Hudnut*, *supra*, this question was elaborately discussed, and the authorities collected. It is there said, in speaking of past profits: "What exists in the present or has existed in the past can not be considered a matter of speculation." It was said by SEEVERS, J., in *Gibson v. Fischer*, *supra*: "Besides this, the rental value must depend on and be measured by the extent of the profits. If there was absolute certainty in human evidence, the one should amount to precisely the same as the other. When the profits are ascertained, the value of the use or rental value is certainly known." We conclude, then, that the evidence as to past profits was properly admitted, not as fixing the measure of damages, but to assist the jury in estimating the damages. In determining damages in a case like that at bar, what evidence could be adduced which would better enable the jury to determine plaintiff's damages than to show what the business had earned? Rental value is of necessity dependent upon

what can be made out of a business or property for the uses for which it is devoted or adapted. These net earnings covering a period of several months before the injury, while by no means conclusive as to the rental value, furnish a fairly safe basis from which to estimate the damages. If, as is contended, the erection of defendant's waterworks resulted in the building and opening of other bath houses, or in the putting in of bath tubs in private residences, whereby plaintiff's patronage would have been lessened, such facts could have been shown. For the same reasons, it was proper to show the extent and character of the patronage of plaintiff's bath house.

IV. It is urged that past profits should not have been shown, because it appeared that, by a moderate expenditure of money, plaintiff could have saved herself from loss, and that it was her duty so to do. *Mill Co. v. Greer*, 49 Iowa, 497; *Douglass v. Stephens*, 18 Mo. 362; *Railway Co. v. Finnigan*, 21 Ill. 646; *Loker v. Damon*, 17 Pick. 284; *Thompson v. Shattuck*, 2 Mich. 615. In this case much testimony was offered touching the ability of plaintiff, by the aid of mechanical appliances, to raise the water from the well when it was lowered by defendant's acts. We think there is a fair conflict in the evidence as to whether, by a reasonable effort and expenditure of money, plaintiff could have avoided the damage resulting from defendant's unwarranted diversion of the water. The question was properly submitted to the jury, and they have said, in effect, that she could not have done so. The finding is not without support in the evidence, and we can not disturb it.

V. Error is assigned on the action of the court in refusing to permit defendant to show that it offered to furnish her free of charge all the water she could use in running her business. This offer was made to plaintiff's husband. The husband operated the business in

his name, and appears to have had entire control of it, as well as of plaintiff's interest, relating to her well. While it may be conceded that it was plaintiff's duty to use reasonable efforts as to time and expenditure of money to lessen or limit her injury, we do not think she was called upon to take water from defendant's pipes. Her right was to take water from her own well, and, even if it was incumbent upon her to take water from the city free, to limit her injury, her damages could not be affected by her failing to do so, in the absence of any showing as to whether or not the cost to her of taking the water from the city would be reasonable. There is nothing in the record which shows, or tends to show, what expense she would have been put to, if she took the water from the city, in connecting with the mains and in providing the necessary appliances for such a change; so that, in any event, defendant has not made such a showing as would require plaintiff's acceptance of the city's offer. The evidence was properly excluded.

VI. Complaint is made that the court, in its instructions, ignored the rule as to contributory negligence, and improperly refused an instruction asked, to the effect, that if during the time for which plaintiff complained, she allowed her own well to flow and waste water, and such waste of water contributed to the injury complained of, she could not recover. In support of the claim that this instruction should have been given, we are referred to the case of *Ferguson v. Manufacturing Co.*, 77 Iowa, 576, 42 N. W. Rep. 448, and other cases. That was a case where the contributory negligence was pleaded by defendant. There is no such issue in the case at bar, and, for that reason alone, the instruction was properly refused. Furthermore, on principle, the cases are clearly distinguishable. No injury would have resulted to plaintiff

if defendant's wells had been so arranged as to have discharged their water at the same level as plaintiff's, and if the city had not pumped from its wells. The waste of water from the wells discharging at the same level would not have affected the flow from any of them, or, if it did, the effect would have been the same as to all of them. Again, the evidence does not show that plaintiff's injury would have been in any way lessened by stopping the flow of her well, when it did flow and was not in use. In any view, there was no error in giving and refusing the instructions complained of.

VII. The court submitted to the jury the question as to whether the flow of water from the Blank and Burrington wells affected the flow from plaintiff's well. It is said that the evidence, without conflict, shows that the flow of these wells did affect plaintiff's well; that it was not a question of dispute. That is true, but the evidence did also tend to show that the flow of these other wells did not *materially* affect the plaintiff's use of her well. We think the instruction complained of is quite as favorable to the defendant as it had a right to ask.

VIII. In the sixth paragraph of the charge, the jury was told that the defendant, under certain circumstances, which were stated, would be liable for the cost of appliances purchased and used by plaintiff in her attempt to procure water from her well after the flow therefrom had been impaired by the defendant's acts. Defendant contends it would only be liable for the value of the use of such appliances while plaintiff retained possession of the property. It does not appear that these appliances added to the value of the property. In fact, the evidence shows that with their use plaintiff could not obtain water. Nor do we think it is shown what the value of said appliances was, if anything, after plaintiff's use of them. The latter part of the instruction reads thus: "If, however, the water could not have been

obtained from said well by the use of such appliances, at reasonable and moderate cost, then the plaintiff would be entitled to recover as damages the value of the diminished use of said property during the time that she was entitled to the use, which would be from the date that the water was diverted from her well as alleged, to the date of the sale and surrender of the property, which was on March 15, 1892, also the reasonable cost, expenses of such appliances as were used and placed therein to diminish the damages to the use; and the defendant would only be liable for so much thereof as its acts had caused the damage to the plaintiff." It is said that the instruction should have read "diminution of the use," instead of "diminished use." Technically, it may be true that the words "diminished use" should be held to refer to the value of the use remaining after the diminution had taken place. In view of the wording of the entire instruction and of the other instructions given, we think the error, if any, was without prejudice. The jury could not from all of the instructions have failed to understand what was the correct measure of damages.

IX. Complaint is made of the giving and refusal to give other instructions. We discover no error in the matters complained of.

Finally, it is urged that the verdict is excessive, and contrary to the law and the evidence. From what has already been said, it will be seen that we think the jury was justified in finding against the defendant. The verdict was not excessive, and was warranted by the testimony. The case is so unusual in its facts, and so important in principle, that we have given it a most thorough investigation and consideration. AFFIRMED.