**KUNDEL FARMS, David G. Kundel, Plaintiffs–Appellants,**

v.

**VIR–JO FARMS, INC., and Virgil Eichelberger, Defendants–Appellees.**

**Dr. David G. KUNDEL, Defined Benefit Pension Plan, David G. Kundel, Trustee, Plaintiffs–Appellants,**

v.

**LAKE TOWNSHIP FENCEVIEWERS, George Reesink, Gordon Streger and Donald Stange, Defendants–Appellees.**

**VIR–JO FARMS, INC., Virgil Eichelberger, President, Plaintiffs–Cross–Appellants,**

v.

**Dr. David G. KUNDEL, Defined Benefit Pension Plan, David G. Kundel, Trustee, David G. Kundel, Defendants–Cross–Appellees.**

No. 89–1894.

Court of Appeals of Iowa.

Jan. 29, 1991.

William F. Creasey of Goedken & Creasey, Muscatine, for plaintiffs-appellants.

Joan U. Axel of Stanley, Rehling & Lande, Muscatine, for defendants-appellees.

Considered by DONIELSON, P.J., and HAYDEN and HABHAB, JJ.

HAYDEN, Judge.

Kundel Farms (Kundel) and Vir–Jo Farms (Vir–Jo) are adjoining landowners. Kundel owns land to the east, north, and west of Vir–Jo. A dispute arose between the parties concerning a fence between their properties. In 1987, at Vir–Jo's request, Lake Township Fenceviewers inspected the property and issued an order. The fenceviewers ordered Kundel to repair and maintain 100 rods of fence and ordered Vir–Jo to repair and maintain 116 rods of fence.

Kundel appealed the fenceviewers' order to district court. Kundel claimed the westerly fifty-five rods of fence it was ordered to maintain are solely on its property and, therefore, outside the jurisdiction of the fenceviewers. Kundel refused to abide by the fenceviewers' order. Vir–Jo repaired the entire fence at its own expense. Vir–Jo repaired this fifty-five rods of fence.

During the same time period, Vir–Jo filed an equity action against Kundel in the district court. Vir–Jo claimed Kundel was obstructing the natural waterflow over its land.

The fence and water disputes were consolidated by the court and, by request of the parties, submitted to a master pursuant to Iowa Rules of Civil Procedure 207–214. The master filed his report finding: 1) the fenceviewers' order was void due to their lack of jurisdiction over a non-partition fence located solely on Kundel's land; and 2) Vir–Jo failed to show Kundel's alterations of the embankment substantially harmed Vir–Jo's land.

Both Kundel and Vir–Jo filed objections to the master's report in district court. The district court held a hearing and allowed the presentation of additional evidence. Following the hearing the district court ruled: 1) the fenceviewers' order is valid because they had jurisdiction over a partition fence located solely on one party's property; and 2) Kundel's alterations of the embankment did not substantially harm Vir–Jo.

Kundel appeals the district court's ruling regarding the fence. Vir–Jo cross-appeals the district court's ruling regarding the waterflow.

Our review of this action brought in equity is de novo. Iowa R.App.P. 4; *Life In-*

*vestors Ins. Co. of America v. Heline*, 285 N.W.2d 31, 35 (Iowa 1979) (action treated as one in equity without objection in trial court is treated as in equity on appeal).

## I. *Partition Fence*

We first address Kundel's argument concerning the fifty-five rods of fence he claims was not a partition fence. The fence in question lies in an east-west course. The property to the south of the fence at one time was held by a different property owner than the property to the north. In 1978 Kundel purchased the property to the north. In 1980 Kundel purchased thirty-four acres to the south of the fence from Robert and Judy Schaapveld. Vir–Jo owns land to the east of this thirty-four acres. Prior to Kundel's 1980 purchase, the fence in question had been a partition fence between the Kundel property and the Schaapveld property.

In 1985 Vir–Jo sent a letter to Kundel asking the "common boundary fence" between Kundel and Vir–Jo be repaired so Vir–Jo could run cattle on its property. This reference apparently included the fifty-five rods solely on Kundel property, which was no longer a partition fence. Kundel did not make the requested repairs. Some of Vir–Jo's cows got through the fence and damaged some of Kundel's corn. The issue of crop damage is not before us in the present case.

The township fenceviewers were requested to order a partition fence and declare each party's responsibilities for maintenance. The fenceviewers' order included the fifty-five rods on Kundel property. Kundel appealed this order to district court.

A Special Master appointed by the district court found the fifty-five rods was not a partition fence. Hence the fenceviewers could not order its maintenance. The Master recommended the original fenceviewers' order be voided and another viewing conducted.

The district court modified the Special Master's report. The court maintained the fifty-five rods was a partition fence "wholly on one side of the division line" pursuant to Iowa Code section 113.17. It therefore reinstated the fenceviewers' order.

Chapter 113 of the Iowa Code concerns the construction and maintenance of partition fences. Partition fences must be "tight." *Id.* § 113.19. "Tight" fences must be adequate to turn livestock. *See id.* § 113.21. The fenceviewers are authorized to declare the responsibilities of adjoining landowners for construction and maintenance of partition fences. *Id.* § 113.3. They may determine "any controversy arising under this chapter ..." *Id.*

The central question for this case then becomes exactly what is a *partition* fence which the fenceviewers may order maintained. We turn to the Iowa Code and case law for the answer.

> The respective owners of *adjoining* tracts of land shall upon written request of either owner be compelled to erect and maintain partition fences, or contribute thereto, and keep the same in good repair throughout the year.

Iowa Code § 113.1 (emphasis added).

> A partition fence, within the purview of the statute, is "a fence *on the line between two proprietors,* where there is no road, alley, or something else that would prevent the erection of such fence." *Hewit v. Jewell,* 59 Iowa 37, 12 N.W. 738.

*Osgood v. Names,* 191 Iowa 1227, 1229, 184 N.W. 331, 332 (1921) (emphasis added).

■ In light of the foregoing statute and case law, we determine the correct definition of a "partition fence" is a fence located on the border between two adjacent properties held by *different owners.* The trial court based its decision on the language of section 113.17. That section reads:

> The provisions concerning partition fences shall apply to a fence standing wholly upon one side of the division line.

Iowa Code § 113.17.

■ The trial court erred in its interpretation of this provision. This section merely provides if the fence is located a few feet or so within the border of one of the landowners' property, chapter 113 still applies. The fenceviewers may still assign responsi-

bility for construction and maintenance between both adjoining landowners. Section 113.17 does not apply to fences wholly on one party's property *which have no relation with the boundaries of the adjoining properties.*

We reverse the trial court on this issue. The order of the fenceviewers is vacated. The fenceviewers shall review the fence in question and reassign responsibility for maintenance in accord with this opinion and Iowa Code chapter 113.

## II. *The Dam*

■ Vir–Jo has cross-appealed the district court's denial of its petition to have Kundel restore the dam in Crane Creek to its original level when Kundel bought the property in 1978. At that time, a thirty-six-inch steel culvert at creek bed level allowed the creek to flow through the dam. The dam itself is actually a causeway traversing a low-lying swampy portion of Kundel's land. This low-lying area extends down into Vir–Jo's property.

Vir–Jo also complained about the type of soil used in constructing the dam. However, other than a brief mention, Vir–Jo has not raised this issue on appeal. Thus, we do not address this issue.

The dam as presently constructed has two fifteen or eighteen inch steel culverts. The first is about two feet above the creek bed level. The second is about nine inches or so above the first. There is no question the positioning and decreased diameter of the present culverts substantially affect the flow of water onto Vir–Jo's servient property.

> [E]very riparian owner has a right to use the water in the stream as it passes along, and an equal right with those above and below him to the natural flow of the water in its accustomed channel, without unreasonable detention, or substantial diminution, either in quality or quantity, and none of such owners have the right to use the water to the prejudice of the others, unless such a right has been acquired by license, grant, or prescription.

Now, each riparian owner has a right to use the water of a surface stream for ordinary or natural uses, and, under certain circumstances, for artificial uses, such as for irrigation and the like; and the better law seems to be that he may use the water for his natural and ordinary wants, regardless of the effect upon other proprietors on the stream; that is, as we understand the rule, one riparian proprietor may, for his natural wants, if necessary, use all of the water in a surface stream, to the exclusion of every other such proprietor, certainly so as against the other proprietor using the water for artificial purposes. In case, however, such a proprietor puts the water to an extraordinary or artificial use, he must do so in such a manner as not to interfere with its lawful use by others above or below him upon the same stream. As to extraordinary or artificial uses, the rights of all proprietors on the stream are equal; and the artificial use is held to be always subordinate to the natural use. If there is not water enough to more than supply the natural wants of the several riparian owners, none can use the water from the stream for artificial purposes. Ordinary or natural uses have been held to include the use for domestic purposes, including household purposes, such as cleansing, washing, and supplying an ordinary number of horses or stock with water, and it is said that natural uses are limited to the purposes above stated. Now, what is a reasonable use of the water of a surface stream for artificial purposes? Clearly, such a use as permits the return of the water used to the stream in its natural channel, without corruption or sensible diminution in quantity. By this is not meant that all the water must be returned to the stream, because in the use some will necessarily be lost or wasted. What is or constitutes such reasonable use must be determined in view of the size and capacity of the stream, the wants of all other proprietors, the fall of the water, the character of the soil, the number of proprietors to be supplied, and all other circumstances. In no case, however, is

reasonable use to be determined in view of the necessities or business of any one proprietor, but the rights of each in the stream for artificial uses are to be determined in view of all of the circumstances as affecting all of the proprietors.... As to a surface stream, the riparian owner may use the entire stream for extraordinary purposes, provided he reasonably, and without sensibly diminishing its volume or impairing its quality, returns it to its accustomed channel. But in this case he could have no such right, else he might for artificial purposes exhaust the entire stream, to the detriment of other well owners situated thereon, and who would be entitled to the use of the water for domestic purposes, as against any artificial use.

*Willis v. City of Perry*, 92 Iowa 297, 302–04, 60 N.W. 727, 729 (1894) (citations omitted).

Vir–Jo desires to use the water in Crane Creek for watering stock and other agricultural purposes. Kundel uses the water to make a wetland so four hunters may rent the land for $1,000 a year. While we find neither use unreasonable, creating a wetland for hunting certainly is an artificial use. As such, Vir–Jo's natural use of the stream to water his livestock takes precedence.

The two foot minimum depth of Kundel's pond will substantially diminish the flow of water onto Vir–Jo's property, especially in drier years. Also, the smaller size of the two pipes and their relative height will further diminish the flow.

We determine Kundel's alteration of the previously agreed upon thirty-six-inch culvert to be impermissible in light of the diminished flow of water to servient properties. Kundel is ordered to return the dam to the former dimensions, with a thirty-six-inch culvert set at creek bed level.

We reverse the trial court on this issue.

### III. *Summary*

The district court's ruling upholding the fenceviewers' order is reversed. The fenceviewers' order is vacated. The fenceviewers are to review and reassign responsibility for maintenance of the fence only insofar as it is a partition fence between Kundel's and Vir–Jo's respective properties.

The district court's ruling denying Vir–Jo's petition concerning its riparian rights is reversed. The dam as presently constructed substantially diminishes the flow of water to the servient property. Kundel is ordered to reconstruct the dam to its former dimensions, with a thirty-six-inch culvert set at creek bed level.

Costs of appeal and cross appeal are assessed to Kundel.

REVERSED WITH DIRECTIONS.

K E Y

E = EICHELBERGER (Vir-Jo)
K = KUIDEL
H = HITCHCOCK
——— = SECTION & PROPERTY LINES
—·—·— = EXISTING FENCE
         (undisputed)
wwww FENCE WHOLLY ON K'S
         PROPERTY LINE