### GAGNON ET AL. *v.* FRENCH LICK SPRINGS HOTEL COMPANY.

[No. 20,284. Filed December 29, 1904.

APPEAL AND ERROR.—*Interlocutory Orders.—Appeal from Several Orders in Single Case.—How Taken.*—Where all the interlocutory orders appealed from were in the same cause, and the appeal as to each decision complained of was taken within the time prescribed by statute (§659 Burns 1901), all such orders are properly included in a single appeal. *p. 690.*

SAME.—*Interlocutory Orders.— What Questions Raised on Appeal.*—Where an appeal is taken from an interlocutory order granting or refusing to

modify an injunction, the question presented is not whether the case made would entitle the plaintiff to relief at the final hearing, but whether the pleadings and evidence furnish such a state of facts as makes the transaction a proper subject for investigation in a court of equity.  *p. 690.*

WATERS AND WATERCOURSES.—*Diversion.* — *Injunction.* — Where the diversion of subterranean waters is purely malicious and not justifiable, and is detrimental to another proprietor, such diversion will be enjoined.  *p. 696.*

SAME.— *Underground Stream.*—*Rights of Landowners Thereto.*—Where subterranean waters flow in a stream with a definite channel, the same rules of law govern as apply to surface streams, and the landowner can not use or destroy such stream at his pleasure.  *p. 696.*

SAME.—*Artificial Uses.*—*Restrictions on Old Doctrine.*—A landowner can not exercise unlimited and irresponsible control over subterranean waters on his own land without regard to injuries to others, but the local conditions, the purpose of the diversion, the use intended, and all other circumstances are to be considered.  *p 697.*

SAME.—*Application of Maxim,* "*Sic utere tuo ut alienum non laedas.*"—The maxim "*Sic utere tuo ut alienum non laedas,*" applies to the landowner's use of subterranean waters and prevents an injury to others without benefit to himself.  *p. 697, 698.*

From Orange Circuit Court;  *T. B. Buskirk,* Judge.

Action by the French Lick Springs Hotel Company and others against George S. Gagnon and others for injunction.  From an interlocutory decree for plaintiffs, defendants appeal.  *Affirmed.*

*George Shirts* and *W. H. Talbott,* for appellants.
*J. W. Kern, A. G. Smith, C. A. Korbly, W. J. Buskirk, McCart & McCart* and *Field & Kurrie,* for appellee.

DOWLING, C. J.—On July 22, 1903, the appellee, the French Lick Springs Hotel Company, together with four other persons, filed its complaint in the Orange Circuit Court against the appellants, George S. Gagnon, the Baden-Lick Sulphur Springs Company, John L. Howard and John C. Howard, asking that the defendants be temporarily restrained and enjoined from pumping water on the premises of the defendants, and from doing other acts alleged to be wrongful and injurious to the property of the plaintiffs, and that, on the final hearing, the injunction be made per-

petual. On the same day, without notice, an emergency being disclosed, in the vacation of said court the judge thereof issued a temporary restraining order pursuant to the prayer of the complaint, and fixed a day for the hearing of said application. On July 30, 1903, the day set for such hearing, the parties appeared, and the complaint was dismissed as to all the plaintiffs except the French Lick Springs Hotel Company, and that company as the sole plaintiff filed two additional paragraphs of complaint. The judge, having heard the proof upon the complaint as amended, on August 3, 1903, in vacation, granted a temporary injunction against all the defendants who had been served with process. On the first day of the next term of the Orange Circuit Court, which was October 26, 1903, an amended complaint was filed by the plaintiff, the French Lick Springs Hotel Company, against the same defendants, and the latter, excepting John C. Howard, who had not been served with process, moved the court to dissolve the temporary injunction then in force, and also to modify it, which motion was overruled on said 26th day of October, 1903. On November 9, 1903, in term, the defendants again moved the court to dissolve said temporary injunction. Their motion was overruled, and, on the application of the plaintiff, the cause was continued until the next term for the closing of the issues and for service of process on the defendant John C. Howard. November 12, 1903, the defendants, the Baden-Lick Sulphur Springs Company and George S. Gagnon, prayed an appeal from the several interlocutory orders, judgment, and decrees of the court in this cause. The appeal was granted, time was allowed for filing bills of exceptions, the amount of the appeal bond was fixed at $500, and it was required to be filed during the current term of the court. Said bond was filed and approved November 13, 1903.

An appeal to the Supreme Court may be taken from an interlocutory order of any circuit court or judge thereof

granting or dissolving or overruling motions to dissolve an injunction in term and granting an injunction in vacation. §658 Burns 1901, subd. 3. The appeal must be taken at the term of court at which the order is made; or, when made in vacation, it must be taken at the time the order is made or during the next term. No appeal can be granted until the party desiring to appeal has filed an appeal bond, as in other cases of appeal. §659 Burns 1901.

The decisions complained of and assigned for error are the overruling of the motion to dissolve the temporary injunction of October 26, 1903, the overruling of the motion to modify the injunction of October 26, 1903, the overruling of the motion to dissolve the injunction of October 26, 1903, and the granting of the temporary injunction of August 3, 1903.

It is objected by counsel for appellee that the appellants can not bring before this court in a single appeal more than a single interlocutory order granting an injunction or overruling a motion to dissolve an injunction. As all the orders appealed from were made in the same cause, and the appeal as to each decision complained of was taken within the time prescribed by the statute, we think that all such orders are properly included in a single appeal.

Upon an appeal from an interlocutory order granting or refusing to modify an injunction, it is not necessary that such a case should be made out as would entitle the plaintiff to relief at the final hearing. It is sufficient if the court finds upon the pleadings and evidence such a state of facts as makes the transaction a proper subject for investigation in a court of equity. *Spicer* v. *Hoop* (1875), 51 Ind. 365; *People's Gas Co.* v. *Tyner* (1891), 131 Ind. 277, 283, 16 L. R. A. 443, 31 Am. St. 433; *Home, etc., Power Co.* v. *Globe Tissue Paper Co.* (1897), 146 Ind. 673, 679. Is this such a case? The French Lick Springs Hotel Company owns some 550 acres of land situated in a valley two and one-half

miles long by three-fourths of a mile wide, known as French
Lick Valley, in Orange county, in this State.  A group of
springs, known as the French Lick springs, possessing heal-
ing and medicinal properties in a high degree, is situated on
the lands of appellee. , The Baden-Lick Sulphur Springs
Company is the owner of eighty acres of land situated to the
north and northeast of the lands of the French Lick Springs
Hotel Company, and adjoining the same.  John C. Howard
and John L. Howard own a tract of land extending from
the hilltops to the northeast. of French Lick springs down
into said valley, and to a point about eighty-five rods dis-
tant from the northeast corner of the lands owned by said
French Lick Springs Hotel Company.  The waters flowing
from the springs known as the French Lick springs had for
more than thirty years been known throughout the United
States to possess healing and medicinal properties, and dur-
ing that time had attracted many visitors to said valley from
all parts of the United States, who came to drink and bathe
in such waters.  During all that time a hotel and health and
pleasure resort had been maintained near said springs,
which was added to and improved from time to time to ac-
commodate the increasing number of guests attracted there
by reason of the properties of said springs, which were nat-
ural flowing springs.

On and before June 25, 1901, this hotel property, con-
sisting of certain frame hotel buildings, the lands aforesaid,
and the natural springs thereon, was owned by said French
Lick Springs Company, of which corporation John L. How-
ard and John C. Howard, parties to this action, were stock-
holders, the said John C. Howard being an officer thereof.
On the date last named said French Lick Springs Com-
pany sold said property to the appellee corporation, the
French Lick Springs Hotel Company, receiving therefor
the sum of $385,000, which was the fair cash value thereof,
but that without said springs the fair cash value of said
property would not have exceeded $20,000; the said appel-

lee corporation being induced to make said purchase and investment solely on account of the existence of said springs, their wide reputation, and the fact that so many guests were attracted thither by reason of their widely known medicinal properties. The appellee corporation, immediately upon taking possession of said property, began the erection of and has completed new hotel buildings thereon at an expense of $140,000, and made other improvements thereon at an additional expense of $125,000, and said property is now of the value of $1,000,000, which value depends upon the continued existence of said springs. The overflow waters from said natural springs on the lands of the French Lick company run from said springs in a well-defined channel, with bed and banks, forming a surface stream through which said waters are carried to and emptied into French Lick creek. Underlying all the land in said French Lick valley is a subterranean body of water, and the waters in the natural springs of the French Lick Springs Hotel Company are forced upward through the rocks by the hydrostatic pressure of said body of water, and for more than thirty years said springs have had a natural flow resulting from said pressure.

Within a year prior to the bringing of the action, the Baden-Lick Sulphur Springs Company and the Howards have each sunk a well on their respective tracts of land in said valley for the purpose of tapping the body of water underlying said valley, and such wells were sunk to such depth as to penetrate such body of water, the Howard well being located at a point eighty-five rods northeast of the French Lick Springs Hotel Company's premises, and 160 rods from the natural springs of said company, and the Baden-Lick well being located about one-half mile north of such springs. The Howard well was sunk by the Howards with a view of devising some method whereby they might intercept the flow of water into the said natural springs of the French Lick Springs Hotel Company, and thereby de-

stroy the value of its property. About the 18th of July, 1903, having theretofore placed in said well a powerful steam pump, they commenced to operate the same, pumping water from said subterranean body of water, knowing that the same was connected with such springs, and knowing that their said pump had sufficient power of suction to draw the underlying waters away from said springs and destroy the same; and with such knowledge continued to operate said pump day and night, drawing millions of gallons of water from said body of water, which they allowed to escape on the ground and run into French Lick creek and be wasted, and such pumping being continued up to the time of the commencement of this action.

Some weeks prior to the 18th of July, 1903, the appellant, the Baden-Lick Sulphur Springs Company, by Gagnon, who acted for it, also placed a powerful pump in its said well, and operated the same almost continuously up to, on, and after said last-mentioned date, drawing from said subterranean basin more than a half million gallons of water each day, and allowing all of the same to escape into French Lick creek and be wasted; such pumping continuing up to the time of the service of the temporary restraining order herein. Gagnon and the Baden-Lick Sulphur Springs Company knew that the removal of a large quantity of water from said subterranean body would result in the destruction of the natural springs, and after the 19th of July they also knew that the joint action of the Howards and themselves in such pumping was resulting in the injury of such springs, and, with such knowledge, continued so to pump and waste said waters until said natural springs of the French Lick Springs Hotel Company ceased to flow, and became for the time practically worthless, and so remained until the service of the restraining order.

Neither the Baden-Lick Sulphur Springs Company nor the Howards had any use for the waters so pumped by them through their respective wells from said subterranean basin

of water, but wasted all of it, and while their pumping was in progress they caused observations to be made to discover its effect on the natural springs of the French Lick Springs Hotel Company; and when they learned that said springs were being exhausted by reason of such pumping, they continued to pump and waste said waters until the flow of water in said springs stopped, and the value thereof for the time being was destroyed. The connection between the wells of the Baden-Lick Sulphur Springs Company and the Howards and the said natural springs of the appellee through said subterranean body of water is so well defined that when the pumping from said wells from any cause ceased for a few hours, the waters would again begin to flow into and out of the said springs, and when said pumping was again resumed the suction from the pumps would again cause said springs to cease flowing.

About 11 o'clock p. m. on July 21, 1903 (the day prior to the commencement of this action), while the pumps in both of the wells referred to were being operated, John L. Howard, one of the appellants, visited the natural spring of the French Lick Springs Hotel Company known as "Pluto," and, finding on examination that the same had ceased to flow, said to his companion: "We have got her down; she has gone to hell." John Stevens, Howard's manager, after the well was sunk on Howard's land, and prior to placing a pump therein, said to John C. Howard: "I want you to get me a good pump and put in there, and I will sink old Pluto to hell." After such pump was procured and placed in operation, and was operated until about the time of the commencement of this action, Stevens again declared: "I have them working on old Pluto, and I don't give a d—n if Pluto goes as dry as a chip." John L. Howard, before sinking the well referred to, said: "I will drill a hole up there deep enough to reach the sulphur water, and it doesn't matter whether it flows out natural or not, for I will put in a compressed air pump, and by this means I can lift the

water from the bottom of the well instead of the top, and when this is done it will lower the fresh-water pressure here, and whenever you affect the fresh-water pressure Pluto will not run out." He again said: "I will have Pluto right here at my door." And again: "When we get through with them [referring to the French Lick Springs Hotel Company], they will either take us back in the company or buy me out at my figures. * * * I know more about Pluto than anybody in this valley, and when I get through with my well they will want me because I can control Pluto." On the 19th day of July, 1903, John C. Howard inspected the three natural springs of the French Lick Springs Hotel Company and found that they had ceased to flow. July 20, 1903, the appellant Gagnon came to the Pluto spring and said to the attendant: "We are pumping you dry. We will make you break your back dipping after that water." On the following day Gagnon came to the Pluto spring again, inquired about it, and said: "It is about as it was the other day when I was here." These conversations occurred one and two days before the commencement of this action. Both Howard and Gagnon were operating their pumps at these times, and continued to do so until they were restrained. After they were compelled to stop pumping, the water again began to flow out of the natural springs. On July 20, 1903, Gagnon, while on the premises of the French Lick Springs Hotel Company inspecting the springs, talking about them and the premises, said: "They think it is a bluff, but I have the winning hand, and by G—d I'm going to play it out."

Dr. John A. Ritter, an old resident of the valley, and landowner there, testified that in 1898 he sunk a well in the valley at a point about a mile and a quarter north of the French Lick springs; that the group of springs in said valley known as the West Baden springs, and a spring owned by one E. B. Rhodes, were situated in the valley between his well and the French Lick springs; that when

his well penetrated to the underlying body of water it flowed a large stream which came up with great force and in large quantities; that shortly afterward the flow of water in the French Lick springs greatly diminished, as did the flow in the West Baden springs and the Rhodes spring; that, to determine the fact definitely, he capped his well, and soon thereafter all of said springs increased in quantity of water and force, and flowed as before; that he again uncapped his well and allowed it to flow, and the springs were again affected and the flow thereof was diminished, whereupon he again capped his well with the result that the said springs regained their natural flow.

The English and American cases cited by counsel for appellants undoubtedly state the general rules which have been applied by the courts to subterranean waters, and we have no inclination to question their wisdom and authority in the particular cases to which they apply. But there are well-recognized exceptions to these rules, and doubtless further exceptions and departures from them will from time to time be found necessary or expedient. Where the diversion of the water is purely malicious, and is detrimental to another proprietor, it may be prevented by injunction. *Miller* v. *Black Rock, etc., Co.* (1901), 99 Va. 747, 40 S. E. 27. So where the water is simply wasted. *Stillwater Water Co.* v. *Farmer* (1903), 89 Minn. 58, 93 N. W. 907, 99 Am. St. 541, 60 L. R. A. 875. If the water flows in a definite channel under ground, the same rules apply to it as apply to surface streams, and the landowner can not use or destroy it at his pleasure. *Southern Pac. R. Co.* v. *Dufour* (1892), 95 Cal. 615, 30 Pac. 783, 19 L. R. A. 92 and note. And the courts of New York have held that the drainage of land of a private owner by a city pumping works, which exhausts from all the ground in its vicinity the natural supply of underground or subterranean water, and thus prevents the raising on it of crops to which it was or would be peculiarly adapted, or destroys such crops

after they are grown or partly grown, renders the city liable to the landowner for the damages he sustains, and entitles him to an injunction against the continuance of the wrong. *Forbell* v. *City of New York* (1900), 164 N. Y. 522, 58 N. E. 644, 51 L. R. A. 695, 79 Am. St. 666.   In *Willis* v. *City of Perry*, 92 Iowa 297, 60 N. W. 727, 26 L. R. A. 124, it was held that a use for natural purposes takes precedence over artificial ones.   A further exception to the rules laid down in *Acton* v. *Blundell* (1843), 12 M. & W. 324, *Chasemore* v. *Richards* (1859), 7 H. L. Cas. 349, and *Ewart* v. *Belfast Poor Law Guardians* (1881), 9 L. R. Ir. 172, was made in the recent case of *Katz* v. *Walkinshaw* (1903), 141 Cal. 116, 70 Pac. 663, 74 Pac. 766, 99 Am. St. 35, 64 L. R. A. 236, where it was declared that the owner of a portion of a tract of land which is saturated below the surface with an abundant supply of percolating water can not remove water for the purpose of sale from wells thereon, if the remainder of the tract is thereby deprived of water necessary for its profitable enjoyment.   See, also, *Bassett* v. *Salisbury Mfg. Co.* (1862), 43 N. H. 569, 82 Am. St. 179 ; *Dexter* v. *Providence Aqueduct Co.* (1840), Fed. Cas. No. 3,864; *Smith* v. *City of Brooklyn* (1897), 46 N. Y. Supp. 141.

The strong trend of the later decisions is toward a qualification of the earlier doctrine that the landowner could exercise unlimited and irresponsible control over subterranean waters on his own land, without regard to the injuries which might thereby result to the lands of other proprietors in the neighborhood.   Local conditions, the purpose for which the landowner excavates or drills holes or wells on his land, the use or nonuse intended to be made of the water, and other like circumstances have come to be regarded as more or less influential in this class of cases, and have justly led to an extension of the maxim, *"Sic utere tuo ut alienum non laedas,"* to the rights of landowners over subterranean waters, and to some abridgment

of their supposed power to injure their neighbors without benefiting themselves.

The only conclusions which can fairly be drawn from the verified pleadings and evidence in this case is that a bitter rivalry exists between the parties to this action, their stockholders and officers, and that, without a real necessity therefor, the appellants dug wells and put machinery and appliances in them, and pumped large quantities of water therefrom, for the purpose of stopping the flow of water of the mineral springs on the land of the appellee. The thinly disguised pretext that some of the acts complained of were done in an attempt to repair a well or stop a leak in it, is an insufficient explanation of the injurious proceedings of the appellants, and wholly fails to convince us of their good faith. It appears, also, from the evidence that the connection between the springs on appellee's land and the subterranean waters on the lands of the appellants is intimate and unmistakable, and that it has been demonstrated by actual experiment that an excessive flow of the waters on the lands of the latter, induced by artificial and unlawful means, exhausts the water and entirely stops the flow of the springs on the land of the appellee.

Following the lead of the later decisions, which, we think, proceed upon just and correct principles, we are satisfied that sufficient cause was shown by the appellee for the granting of a temporary injunction upon each application therefor, and that the case presented was such a one, at least, as was proper for the investigation of the court in the interests of justice. Kerr, Injunctions, 14-32. In view of the evidence in the case, the appellants were not entitled to a modification of the order of injunction.

In our opinion, the court did not err in any of its rulings, and the judgment is affirmed