ED. ERICKSON v. CROOKSTON WATERWORKS, POWER & LIGHT COMPANY.[1]

April 1, 1907.

Nos. 14,976—(95).

**Use of Subterranean Waters.**

The fundamental principles of right and justice upon which the common law is founded, and which its administration is intended to promote, lead to the adaptation of its rules concerning the use of subterranean waters to the nature and necessities of the environment.

**Same—Adjoining Landowners.**

The law of correlative rights applies to the use by adjoining landowners of waters drawn from an artesian basin. Such proprietors must so use their wells as to not unreasonably injure their neighbors.

**Same—Right to Sell Water.**

The circumstances of a particular case may render it illegal for such landowner to make merchandise of such supply in a particular manner.

**Same—Water Company's Pumping.**

A water company acquired title to lands on which were wells flowing from an underground basin, the source of supply of a hundred or more similar wells on lands of adjoining owners in the natural use of the soil. It is *held*, that the water company had no right to deprive them, or any of them, of water by use of artificial force in pumping the water in the artesian basin to a low level, in order that it might supply a neighboring community with water as merchandise.

Appeal by plaintiff from an order of the district court for Polk county, Watts, J., denying a motion to set aside an order granting a

[1]Reported in 111 N. W. 391.

100 M.—31

motion for judgment in favor of defendant on the pleadings, and also denying a motion for a new trial. Reversed.

The complaint in this action substantially alleged: Plaintiff and appellant is the owner and in possession of certain lots upon which there is an artesian well, from which plaintiff gets water for domestic and other purposes. It is one of more than a hundred artesian wells in and near Crookston which flow "from water underground strata in that territory, and artesian producing strata." The defendant and respondent is a corporation which furnishes water for public use in said city through a waterworks system. Until 1899 that system had been supplied with water from Red Lake river. In 1902 and 1903 defendant inaugurated a plan to secure a supply of water from a system of artesian or flowing wells to be sunk to great depths and of large dimensions, and to artificially force the water by means of steam, electric, or other powerful pumps, and thereby to secure sufficient water to supply said city with artesian well water for all purposes. Pursuant to such plan the defendant secured a site for two wells, enlarged them and sunk them deeper, and pumped large quantities of water from them. By reason of this pumping the point to which water in other wells came was made seventy five feet lower than the point to which it formerly rose. The effect on plaintiff's well and on the wells of adjoining landowners has been to injure and destroy them for domestic use. Defendant mixed the pure artesian well water with river water in its pipes, and sold the unfit and unsafe mixture for drinking and cooking and other purposes. Defendant answered. Plaintiff replied with a general denial. This suit was for an injunction. Defendant moved for judgment on the pleadings, which was granted. This appeal was taken from an order denying plaintiff's motion for a new trial.

*L. E. Gossman* and *N. B. Moran,* for appellant.

*Rome G. Brown, Charles S. Albert,* and *Arnold L. Guesmer,* for respondent.

JAGGARD, J. (after stating the facts as above).

The subject is a comparatively modern one. The first English case dealing with underground waters (Hammond v. Hall, 10 Sim. 552, 4 Jur. 694) was decided in 1840. The case which has become recog-

nized as the leading one was Acton v. Blundell, 12 M. & W. 324, decided in the Exchequer Chamber in 1843. Tindale, C. J., delivering the opinion of the court, held that percolating subterranean waters were governed by the law applicable, not to water courses, but to surface waters. Dickinson v. Grand (1852) 7 Exch. 301, 21 L. J. Exch. (N. S.) 241, held that the diversion of water, in that case caused by digging a well on defendant's land, was an actionable wrong. In Broadbent v. Ramsbotham (1856) 11 Exch. 602, Parke, B., remarked that "that case only decided that, if a person has a right to a stream jure naturæ, he has a right to its subterranean course." In 1857 was decided the controlling case of Chasemore v. Richards, 2 H. & N. 168, 7 H. L. 349, holding that the principles which regulated the rights of owners of land in respect to water flowing in known and defined channels, whether upon or below the surface of the ground, do not apply to underground water, which merely percolates through strata in unknown channels. Lord Wesleydale, however, said that, "according to the rule of reason and law, 'Sic utere tuo ut alienum non lædas,' it seems right to hold that he [a landowner] ought to exercise his right in a reasonable manner, with as little injury to his neighbor's rights as may be. * * * But I doubt very greatly the legality of the defendant's acts in abstracting water for the use of a large district in the neighborhood, unconnected with his own estate, for the use of those who would have no right to take it directly themselves, and to the injury of those neighboring proprietors who have an equal right with themselves. It does not follow that each person who was supplied with water by the defendant could have dug a well himself on his own land and taken the like quantity of water, so that the defendant may have taken much more than would have been abstracted if each had exercised his own right." When the right was asserted to intercept the waters of a spring, the source of supply of a running stream, in Grand v. Shugar, 6 Ch. App. 483 (1871), Lord Hatherly denied the existence of such right, saying in respect thereto, with the Chasemore case before him: "If you cannot get at the underground water without touching the water in a defined surface channel, I think you cannot get at it at all." The suit in that case was for an injunction restraining the defendant from diverting, by means of a drain excavated upon defendant's land, the water of certain springs which ran

into a pond. In Mayor v. Pickles, [1895] App. Cas. 587, Chasemore v. Richards was followed, although what was done was, in the language of the pleader, done "maliciously." "This is not a case in which the state of mind of the person doing the act can affect the right to do it. If it was a lawful act, however ill the motive might be, he had a right to do it. If it was an unlawful act, however good his motives might be, he would have no right to do it." Per Lord Halsbury, L. C.

The English rule was of necessity based upon the geological conditions affecting water supply as they existed in England. The reasons for the rule lay in deductions from essentially absolute private rights in land, and also largely in the conception of a sound public policy applicable to those conditions. It was thought that the recognition of correlative rights in subterranean waters would work mischievous results in curtailing improvements on land, would burden its use with liabilities which would render the exercise of legal rights extremely hazardous, and would result in a rule which would be too indefinite in itself and which the landowner would not be able to satisfactorily enforce.

In view of this history, the English rule is not binding upon the American courts. It does not create rights and duties which American courts must recognize, as they would be compelled to recognize rights and duties created by that common law which is a part of the law of our land, like the law, for example, of trespass to person or property. The American courts are confronted with varying, and in many cases utterly different, geological conditions and problems of water supply. It is evident on its face that rules which might work well in an island like England might operate disastrously if indiscriminately applied to so diversified a continent as this, with its varying mountainous regions, its well-watered plains, its stretches of arid land, once known as the "Great American Desert," and its differing lake regions. Nothing is better settled than that the fundamental principles of right and justice on which the common law is founded, and which its administration is intended to promote, require that a different rule should be adopted whenever it is found that, owing to the physical features and character of a state, and the peculiarities of its climate, soil, products, and water supply, the application of a common-law rule tends constantly to cause injustice and wrong, rather than the administration of justice

and right.· Katz. v. Walkinshaw, 141 Cal. 116, 70 Pac. 663, 74 Pac. 766, 64 L. R. A. 236, 99 Am.· St. 35.

So long as the existence of a substantial artesian well basin appears, we are at a loss to see that a complete reversal in legal principles applicable should .be effected by the fact that its presence is not defined on the surface of the earth and is made known only by penetrating the ground.   Why should not analogous rules apply to a lake demonstrated to exist underground as to one in plain sight?   No reason in harmony with modern denial of absolute rights, unless the question be begged, is supplied by deduction from the ownership of the soil.   While water is to be defined as a mineral, the rules of law as to its use must logically vary from those applicable to coal, ore, and the like.   Water is a fluid, and mobile, "a fugitive."   Coal and ores have a fixed and permanent place.   The analogy to natural gas and oil is more apt.   Their natural use, however, is as merchandise.   Even the owner's right to use and sell an unlimited quantity of that product of Nature's alchemy may be subject to prohibition of waste by statute. The whole subject will be found reviewed and considered in Ohio Oil Co. v. Indiana, 177 U. S. 212, 20 Sup. Ct. 585, 44 L. Ed. 740. Water, although in large measure a commodity of commerce, is essential to the natural use of land for agriculture and other purposes, and to the support of human life itself.   A rigid rule, applying to underground waters the law applicable to surface waters in various jurisdictions, might work insufferable hardship, and put the control of an element as necessary to life as air itself into the hands of a monopoly. In the nature of things there are parts of the country, as in this state, where well-defined bodies of water exist as unmistakably under the ground and out of sight as upon the surface of the ground.   Under a proper system of legal rules this "gift of Providence" may be made to support agriculture, appropriate industries, and human life.   Arbitrary and artificial restrictions might readily make large areas uninhabitable save by an unnatural tribute to exclusive individual control.

The American courts, taken as a whole, in recognition of such considerations, have viewed the matter from the point of view of public interests and of the natural use of natural advantages; that is to say, they have modified the supposedly absolute right of a man to use his own as he sees fit, under the maxim, "Whose the soil is, his it is from

the heavens to the depths of the earth," by reference to the maxim of the civil law that "One must use his own so as not to injure another." It is not material whether this doctrine of correlative rights be regarded as the main rule, or whether the English cases be accepted as laying down the general rule to which the law recognizes many exceptions, as was held to be the case in Gagnon v. French, 163 Ind. 687, 68 L. R. A. 175, 178, 72 N. E. 849.

The early American cases were in accord with the English opinion. Greenleaf v. Francis (1836) 18 Pick. 117; Roath v. Driscoll, 20 Conn. 533, 52 Am. Dec. 352; Wyandot v. Sells, 6 Ohio N. P. 64, 9 Ohio S. & C. P. Dec. 106; Warder v. Springfield, 9 Ohio Dec. 855. And see Edwards v. Haeger, 180 Ill. 99, 54 N. E. 176. There are many other American authorities to the same effect. 30 Am. Law Reg. (N. S.) 246. Wheatley v. Baugh, 25 Pa. St. 528, 64 Am. Dec. 721 (justly regarded as a leading case), followed that rule, but also recognized the applicability of the maxim, "Sic utere tuo." Later American opinions, however, have followed, not the general conclusion in Chasemore v. Richards, but the view of Lord Wesleydale, previously quoted.

This is distinctly true in this state. Even with respect to surface water, the so-called common-law rule has here been modified. The liability of the landowner for diverting surface water proper to the injury of another has been made to depend upon the necessity and reasonableness of the act. This, which has come to be known as the "rule in Sheehan v. Flynn" (59 Minn. 436, 61 N. W. 462, 26 L. R. A. 632), while originally much of a departure from general opinion, and as such even at the present time the subject of much criticism, has been adopted to a considerable extent by other states in spirit and letter.

In view of the clear acceptance of that rule in this state, it would be difficult in this case for the defendant to prevail. Moreover, in Stillwater Water Co. v. Farmer, 89 Minn. 58, 93 N. W. 907, 60 L. R. A. 875, 99 Am. St. 541, and 92 Minn. 230, 108 N. W. 824, this court again made "something of a departure from the general doctrine found in the books" and took "an advanced position." 89 Minn. 65, 93 N. W. 907, 60 L. R. A. 875, 99 Am. St. 541. The opinion in that case pointed out that in Bassett v. Salisbury, 43 N. H. 569, and Swett v. Cutts, 50 N. H. 439, 9 Am. 276; particularly, and in some other

cases, the doctrine of correlative rights in subterranean waters had been recognized. In view of the actual conditions in this state, the court there held that, "except for the benefit and improvement of his own premises, or for his own beneficial use, the owner of land has no right to drain, collect, or divert percolating waters thereon, when such acts will destroy or materially injure the spring of another person, the waters of which spring are used by the general public for domestic purposes." The specific application was that "he must not drain, collect, or divert such waters for the sole purpose of wasting them." In the subsequent reports of this case this doctrine was followed, and nothing, as we view it, was said justifying the right of defendant to prevail in the case at bar. In 92 Minn. 232, the court recognized that the proposed waters might be used for a public sale and consumption. That such a use of water flowing naturally in exceptionally large quantities might be proper under the particular circumstances of that case is entirely consistent with holding it to be unreasonable, under entirely different circumstances, to exhaust the artesian well supply of a community by artificial force.

The rule in New York is in entire accord. See Mr. Edward Hatch, 1 Columbia Law Rev. (1901) 505, et seq. That in Smith v. City, 46 N. Y. Supp. 141, 18 App. Div. 340, Id., 52 N. Y. Supp. 983, 32 App. Div. 257, and Id., 160 N. Y. 357, 54 N. E. 787, 45 L. R. A. 664, injury resulted to a natural surface stream, and in Forbell v. City, 164 N. Y. 522, 58 N. E. 644, 51 L. R. A. 695, 79 Am. St. 666, to marshy land used for growing celery and water cresses, and that in both cases the water was carried some distance do not serve to differentiate those cases from the one at bar. This is equally clear from a mere statement of the attempted distinction and from the language of those decisions. In the Forbell case, Landon, J., said: "In the absence of contract or enactment, whatever it is reasonable for the owner to do with his subsurface water, regard being had to the definite rights of others, he may do. He may make the most of it that he reasonably can. It is not unreasonable, so far as it is now apparent to us, that he should dig wells and take therefrom all the water that he needs in order to the fullest enjoyment and usefulness of his land as land, either for purposes of pleasure, abode, productiveness of soil, trade, manufacture, or for whatever else the land as land may serve. He

may consume it, but must not discharge it to the injury of others. But to fit it up with wells and pumps of such persausive and potential reach that from their base the defendant can tap the water stored in the plaintiff's land, and in all the region thereabout, and lead it to his own land, and by merchandising it prevent its return, is, however reasonable it may appear to the defendant and its customers, unreasonable as to the plaintiff and the others whose lands are thus clandestinely sapped and their value impaired."

In Willis v. City, 92 Iowa, 297, 60 N. W. 727, 26 L. R. A. 124, plaintiff's flowing well was on her lot in the defendant city. It was held that no one of several owners of wells tapping a subterranean stream can so use its water for artificial purposes (as a city supplying it to its inhabitants) as to deprive the other, at times, of the ability to use it for artificial purposes. The doctrine of the Farmer case was accepted in Barclay v. Abraham, 121 Iowa, 619, 96 N. W. 1080, 64 L. R. A. 255, 100 Am. St. 365. And see Gagnon v. French, 68 L. R. A. 175, 163 Ind. 687, 72 N. E. 849; St. Amand v. Lehman, 120 Ga. 253, 47 S. E. 949; Pence v. Carney, 58 W. Va. 296, 52 S. E 702; 4 Mich. Law Rev. 541; 6 Current Law, 1848.

One of the best reasoned and most elaborately considered cases to be found on this subject is Katz v. Walkinshaw, 141 Cal. 116, 70 Pac. 663, 74 Pac. 766, 64 L. R. A. 236, 99 Am. St. 35, 64, note. It was there held that a portion of a tract of land, which is saturated below the surface with an abundant supply of percolating water from mountain slopes to the valley, where it reaches an impervious barrier, and is held under an impervious stratum of earth, so that, when the latter is perforated, the pressure from above causes artesian wells, cannot be regarded as a water course, so as to confer riparian rights upon the owners of the surface. The owner of a portion of a tract of land, which is saturated below the surface with an abundant supply of percolating water, cannot remove the water from wells thereon for sale, if the remainder of the tract is thereby deprived of water necessary for its profitable enjoyment. Houston v. East, 66 L. R. A. 738, 107 Am. St. 620, 98 Tex. 146, 81 S. W. 279, is consistent with this view. That decision approved the natural use of water for manufacturing or the like on the owner's premises and doubted the right to exhaust the supply for sale.

Huber v. Merkel, 117 Wis. 355, 94 N. W. 354, 62 L. R. A. 589, 98 Am. St. 933, is inconsistent with the conclusion here reached. The merits of that opinion justify little more than reference to it. Mr. Farnham, in his valuable work on Waters and Water Courses, at page 2717, criticising that case, says: "While the Wisconsin court pushes the doctrine to the extent of holding that a landowner has the right to sink a well on his land and use the water therefrom as he chooses, or allow it to flow away, regardless of the effect of such use upon his neighbor's wells, and such right is not affected by malicious intent, there is absolutely no principle on which that decision can be founded. It is opposed to good morals, good sense, and all common-law principles which are applicable to analogous subjects, and the later and better considered cases are beginning to recognize correlative rights in percolating waters and confine landowners to a reasonable use of it." And see note to 98 Am. St. 933, 945; Barclay v. Abraham, supra.

The conclusion follows, accordingly, that the defendant had no vested right to deprive the plaintiff of pure water provided in the natural use of his artesian well by the use of artificial force in pumping the basin of supply to a low level, and could not indirectly compel him to buy from it, although at a price regulated by public authority, the same water corrupted with the river water with which the defendant mixed it.

Order reversed.

START, C. J.

I concur in the result, on the ground that the defendant, by polluting the artesian water by mixing it in its mains with impure river water to the extent alleged in the complaint, is making an unreasonable use of the pure artesian water, to the injury of the plaintiff and other landowners similarly situated.