ED. ERICKSON v. CROOKSTON WATERWORKS, POWER & LIGHT
COMPANY.[1]

July 31, 1908.

Nos. 15,583—(159).

**Subterranean Waters—Rights of Adjoining Landowners.**

The rule announced in Erickson v. Crookston W. P. & L. Co., 100
Minn. 481, that the law of correlative rights applies to the use of artesian
waters by adjoining landowners, is adhered to.

**Same—Reasonable Use.**

What constitutes reasonable use is a question of fact to be deter-
mined from the facts and circumstances of each particular case.

**Same.**

Appellant is a corporation organized for the express purpose of fur-
nishing water to the inhabitants of the city of Crookston for domestic
and municipal purposes. For a number of years the water for such
purposes was taken from the Red Lake river, and distributed through
a system of mains and hydrants, and used indiscriminately for domestic
purposes, and for flushing sewers, sprinkling streets, extinguishing fires,
running elevators, etc. The river water having become contaminated,
appellant was obliged to resort to the artesian basin underlying the
city to secure suitable water for its purposes, and in so doing, al-
though it installed the most economical and approved method of pump-
ing the waters, it resulted in lowering the head of respondent's well,
so that it became necessary for him to resort to the use of artificial
power.

**Same—Correlative Rights.**

Pumping by appellant from the artesian basin for the purpose of
furnishing water to its inhabitants, for domestic purposes, does not
constitute an artificial taking as distinguished from the right enjoyed
by private well owners. Both stand upon the same basis, subject to
the rule of correlative rights.

**Same—Evidence.**

The court was not justified by the evidence in limiting the use of
artesian waters by appellant in its present system of mains so that it
should not lower the head of water in respondent's well below the
point of fifty feet from the surface, and in further finding that it would
be an unreasonable burden to require respondent to resort to the neces-

[1] Reported in 117 N. W. 435.

sary means of pumping the water from a depth of more than fifty feet. Whether respondent, and others similarly situated, may be required to lift the water in their wells from a point below fifty feet, depends upon whether it is reasonably necessary for appellant to reduce the head of water below that point in order to furnish the inhabitants of Crookston and the municipality with water for all the purposes mentioned.

**Same.**

The evidence did not justify the trial court in finding that it was commercially feasible and practicable to install in the city an independent system of mains and pipes for the purpose of furnishing river water for other than domestic purposes.

Action in the district court for Polk county to enjoin defendant and its agents from using pumps in defendant's wells to reduce the level of the water from its normal level whenever such use injures and interferes with plaintiff in the natural use of his well to secure water therefrom for domestic and other purposes; pending this suit to obtain a temporary injunction against defendant restraining it from these unlawful acts, and to recover $3,000 for injury already caused by defendant's alleged wrongful use of its wells. After the former appeal (100 Minn. 481) the cause was remanded, plaintiff amended his complaint, and the case was tried before Watts, J., who made findings of fact and ordered judgment in favor of plaintiff in the sum of $290 and that defendant be restrained from operating the so-called Bessie street well so it will reduce the head of artesian water in plaintiff's well more than fifty feet below the surface of the ground when plaintiff is not pumping or otherwise taking water from the well, and that if furnishing artesian water through separate mains for household and domestic purposes reduce the water in plaintiff's well more than fifty feet, the injunction should be modified to allow all artesian water required to be taken for such purposes by defendant through such separate system of water mains. From an order denying defendant's motion for a new trial, it appealed. Reversed.

*Rome G. Brown, Charles S. Albert,* and *Arnold L. Guesmer,* for appellant.

*L. E. Gossman* and *N. B. Moran,* for respondent.

LEWIS, J.

Upon the former trial the cause was disposed of in the court below by granting appellant's motion for judgment on the pleadings. It

was held (100 Minn. 481, 111 N. W. 391, 8 L. R. A. [N. S.] 1250) that appellant had no vested right to deprive respondent of the natural use of his artesian well by the use of artificial force in pumping the basin of supply to a low level, indirectly compelling him to purchase from appellant water which had been contaminated by intermingling it with river water. The cause, having been remanded, came on for trial upon the merits, and a clear comprehension of the case requires a full statement of the facts as found by the trial court.

Respondent was the owner of certain lots in Sampson's Woodland addition to Crookston, upon which were located his residence, barns, and other structures suitable for live stock, of which he owned a considerable number. About six years before the commencement of this action he caused to be constructed upon his premises an artesian well one hundred seventy five feet deep, incased in a two-inch pipe, through which artesian water flowed to the surface in sufficient quantities for all domestic uses. Appellant is a corporation organized in 1885 for the purpose of constructing, maintaining, and operating a system of waterworks in the city of Crookston to supply the inhabitants thereof with water. From 1885 to 1899 appellant continued to operate and maintain its system of works for such purposes, supplying the inhabitants with water carried from the Red Lake river through mains, pipes, and hydrants. About the year 1899 the company extended its intake pipe further up the river to avoid contaminated water, and also constructed a filtration plant for the purpose of purifying the water. The filtration plant proved to be a failure, on account of impure substances in the sand, and appellant then began operations to secure artesian water.

In addition to the facts above stated the court found as follows:

"7. That the artesian well water secured in the city of Crookston and vicinity is artesian water secured from underground artesian strata of sand and gravel into which the water percolates, and that these strata lie at different elevations in different localities. That underneath the surface in and about said city there are four water-bearing strata of sand and gravel from which artesian wells have been obtained:

"First, a stratum seventy to eighty feet below the surface, which is in two narrow streaks and does not furnish much water.

"Second, a stratum one hundred forty feet to one hundred eighty feet below the surface, which extends over the north part of the city and is more than two-thirds of a mile wide.

"Third, a stratum one hundred seventy five feet to two hundred twenty five feet below the surface, which extends over that south part of the city and is more than a mile wide.

"Fourth, a stratum about three hundred twenty five feet below the surface, about which the evidence discloses little. That the above-named strata, numbered second, third, and fourth, probably have an outcropping in the higher land eight or ten miles east or southeast of the city of Crookston, where the water supply is replenished by the rainfall. That they lie between hardpan and clay, impervious to water above and below, and carry water through gravel, or sand and gravel, so that, by boring through the upper stratum or strata, wells commonly known as 'artesian wells' can be obtained in a great many places and water derived from them; and that at the time said pumping commenced in said Bessie street well there were more than fifty artesian wells in said city.

"8. That there is nothing upon the surface of the ground by which it can be determined whether at any particular place a flow of water can be obtained by boring, or as to the depth to which boring would be necessary in order to procure a flow of water, and the only means of determining whether artesian water can be got and the strata from which it is obtained is from the positions and flows of the wells already made, or the failures to get water; but after a fair number of such wells have been bored in any locality it can be known with a large degree of certainty, but not with absolute certainty, whether or not artesian water can be obtained at any point in such locality in the city of Crookston and vicinity and the depth required to get it.

"9. The waters of the Red Lake river are unwholesome and unfit for drinking and culinary purposes and other domestic purposes, and they are unsafe for drinking and culinary purposes. The waters from any of the artesian wells in Crookston and vicinity, including those of plaintiff and defendant, are pure and wholesome for all purposes, including drinking purposes, culinary purposes, and for all household purposes, and may be safely used for all such purposes

and for general use. The waters of the Red Lake river, besides being generally unfit for domestic uses, are, particularly at certain times of the year, also affected by organic substances which color and make the waters still more impure and objectionable for domestic purposes.

"10. The said defendant at some time prior to the year 1899 became the owner and secured the possession thereof and has ever since been in possession of lot nine of block three and lot three of block seven of Clement's addition to Crookston, Minnesota, and a certain lot in block three of C. M. Loring's addition to Crookston, Minnesota; that at the time the said lots in Clement's addition to Crookston, Minnesota, became the property of said defendant, there was situated thereon an artesian well, known as the 'Bessie street well,' which said well was bored to the depth of about two hundred fifteen feet and had a two-inch pipe therein. During the summer of 1902 said defendant bored a new well upon the site of the Bessie street well, which well had a ten-inch pipe therein and was two hundred fifteen feet deep, and after such enlargement flowed about twenty eight thousand gallons of water per day above the surface of the ground. In the spring of 1903 the defendant bored in lot three of C. M. Loring's addition an eight-inch well, which was one hundred seventy feet deep, near the present site of the steam power house, which well is known as the 'Steam Power House well.'

"11. Immediately after it became known to said defendant that the plan of purifying the water of Red Lake river by means of filtration plant was not feasible, and that said method was a failure, said defendant formulated a plan to furnish to its customers, the citizens of Crookston and the public, through the water system of said defendant, artesian water for all purposes, which artesian water said defendant planned to procure from the Bessie street well and the Steam Power House well, and such other wells as should be necessary in order to supply the defendant's entire system with artesian water, and for that purpose the Bessie street well was enlarged to a ten-inch pipe and the Steam Power House well was bored with an eight-inch pipe. Tests were made for about three weeks of each of these wells by continuous pumping, and these tests showed that there could be secured from said wells enough water to supply two hundred forty thousand gallons of water each day of twenty four

hours for use in said water system without exhausting the supply in either of said wells. That during the past year defendant has been pumping regularly from said Bessie street well about two hundred thousand gallons of water per day and from said Power House well about forty thousand gallons per day.

"12. That in order to further supply said artesian water defendant in the beginning of the year 1907 established a third well in connection with its said waterworks system, known as the 'Maple Bay well,' and that from said well last named it has been pumping regularly a quantity of water of about seventy thousand gallons of water per day. The Bessie street well is not connected with the Power House well or the Maple Bay well; but whether or not the two wells last named are connected is doubtful. Defendant has already expended in carrying out of its plan to furnish artesian water over $20,000, and, so far as it may be necessary and defendant shall be permitted, as part of the same plant it is the intention of defendant to establish other wells to be similarly used.

"13. That the total amount of water necessary for use in the system of waterworks of said defendant company, so far as the same has been extended and used, is three hundred ten thousand gallons a day of artesian water, and in case of a fire or fires river water in addition. This includes what is furnished to Northern Pacific Railway Company, which is about twenty thousand gallons per day, and Palace Hotel elevator, which is ten thousand to twenty thousand gallons per day; and defendant intends to pump water from the river to supply said railway company without putting it through its mains, which is quite feasible, and adopt a system which will lessen the amount of water required for said hotel elevator. Defendant, in connection with its water supply system, has a reservoir of two hundred fifty thousand gallons' capacity.

"14. As part of the plan of said defendant for furnishing artesian water in its waterworks system defendant intends to institute a meter system to prevent the waste of water furnished by it, and by said system the amount of water used will be reduced about twenty five per cent.

"15. The method of defendant's use of its said wells, which method it intends to pursue as part of its said plan for furnishing artesian

water to said city, is as follows: Defendant determines by tests what the capacity of supply of its said wells is without exhausting the supply of water coming through said wells. Defendant then pumps within said capacity, and pumps by electrical power through pumps whose cylinders draw water about one hundred feet from below the surface of the ground. The effect of this pumping is and will be to diminish the height to which the water naturally rises in said wells to a point from seventy to one hundred feet below the surface of the ground and to diminish the height to which water rises in some other wells connected with the same strata to approximately the same height.

"16. The said well of plaintiff is not connected with the said Power House well of defendant, nor with the said Maple Bay well; but by reason of the pumping by defendant in said Bessie street well, the height to which the water naturally comes in plaintiff's said well has been and will be diminished from the surface flow to a height of seventy to one hundred feet below the surface of the ground.

"17. The said pumping by defendant of its said wells, while having the effect to lower the head of water in said wells, has not had the effect, nor will it have the effect, of exhausting the natural supply of water in said wells, or either of them, or other wells in the city of Crookston connected with the same strata. The only effect is to diminish the head and lessen the pressure.

"18. The method of pumping which has been followed by defendant, and which defendant intends to follow, is the best and most economical method of getting the largest supply of water from the artesian strata or basin in which the said wells respectively are situated. It is the best method of getting the largest supply possible without exhausting the supply; the only effect being to diminish the head and lessen the pressure.

"19. These artesian wells, as artesian wells in general, will supply, without exhausting the water supply, varying quantities of water according as the height at which the water is taken varies. A well which flows at the surface may not flow at all at ten feet above the surface. The same well again may furnish, without diminution or exhaustion of the supply of water, a very much larger quantity of water from a point below the surface than it will at the surface. The most economical and efficient way of using an artesian well for the

purpose of obtaining the largest supply of water without exhaustion is to take the water by means of pumps at a point below the surface where the pressure is greatest, and where by reason of such pressure the supply from the well and the basin with which it is connected will be increased.

"20. The method of pumping by defendant in its wells is, according to modern scientific and hydraulic methods and according to the usual use of such wells, for the purpose of getting the largest supply without exhausting the same.

"21. That by defendant's use of its Bessie street well plaintiff ever since July, 1905, has been compelled to pump the water from his well from points seventy to one hundred feet below the surface of the ground by means of a deep-well pump which it is not feasible to operate by hand power, but requires power by windmill or other machinery in the ordinary and reasonable use of the same. That by the use of such machine power plaintiff could have at all times obtained a sufficient supply of water for household purposes and for his stock by taking out the screen at the bottom of the well and pumping out loose sand and gravel, making a small reservoir, which would cost from $50 to $100. That hand pumping is not reasonably feasible in the use of artesian wells when the head of water, as it stands in the pipe when the pump is not in motion in it, is reduced more than fifty feet below the surface of the ground.

"22. That defendant's waterworks has only one system of water supply mains, and is the usual and ordinary system of supplying cities of the size of Crookston, and what it is likely to grow to be for some time at least, with water, where there is a plentiful supply of water suitable for such purposes from one source, either running or standing on the surface of the ground, or from an artesian supply. Crookston is a city of about eight thousand inhabitants, and defendant's system of waterworks does not supply more than one-half of these people with water, and the probabilities are that not enough artesian water can be got by defendant for fire protection, fire company's practice, and flushing gutters which it is required to furnish to the city, and for street and lawn sprinkling, and the requirements of the people of the city for household purposes and watering live stock; but that the artesian water supply available in the city of Crookston is sufficient for its inhabitants for household pur-

poses and watering live stock kept in the city without lowering the artesian head of water more than fifty feet lower than the surface of the ground at the said well of plaintiff. That it is practicable to install and operate a separate system to supply artesian water for household or drinking and culinary purposes only, and another system for other purposes. About the only additional cost of such double system would be the expense of putting in and maintaining other mains and making connections. This would increase the cost of furnishing to the consumer, but the probabilities are it would much increase the demand for artesian water from defendant, even though the cost of it should be increased.

"23. That the costs, expense, and damages not too remote or speculative for recovery to plaintiff, so far as any such are unlawfully caused by reason of defendant's said pumping as the same exists and is likely to exist under defendant's proposed plan of improving its water supply as aforesaid, are and will be always capable of being approximately ascertained and can be recovered by action or actions at law.

"24. The defendant, besides its system of waterworks, operates a power plant by which electrical power and light are furnished throughout the city. Defendant has been for compensation furnishing to plaintiff power to run plaintiff's pump by which water is pumped from plaintiff's artesian well, and it is feasible for plaintiff to take and for defendant to furnish power to plaintiff by which from plaintiff's well there may be obtained by plaintiff water of a quantity and quality equal to that obtained and used by plaintiff previous to the pumping by defendant, and as much as would be required in ordinary use of plaintiff's said premises without any more inconvenience than before, if a reservoir were made and maintained at the bottom of plaintiff's well as before stated. By such substitution of power by defendant, and the payment of all expenses caused by such substitution and maintenance of same, and cost of making and maintaining reservoir at the bottom of plaintiff's well as aforesaid, plaintiff would be put in as good position in regard to the use of water from his said well as he was before the same was affected by defendant's pumping, and if such power and expense were furnished by defendant the plaintiff would not suffer any further damages by reason thereof in the manner defendant has been doing it.

"25. That as part of its plan of improvement of said city's water supply it is the purpose and intention of defendant, if it can do so, to supply artesian water through its single line of mains for all purposes for which water is used from its system.

"26. That mixing river water with artesian water and furnishing the same to the people of the city of Crookston for domestic purposes in the manner defendant has been mixing and furnishing it is unsanitary and dangerous to the public health.

"27. That a large portion of the people of the city of Crookston live outside of the limits of extension of defendant's waterworks system and cannot get water from it.

"28. That the head of artesian water in several other wells in the city of Crookston and vicinity, along with the well of plaintiff, has been lowered from seventy to one hundred feet below the surface of the ground by the said pumping in the Bessie street well, and made so it is not practicable by hand pumps to procure sufficient supplies of water from them for general household purposes; and all wells in Crookston and vicinity which are supplied with water from the same stratum as the Bessie street well have been lowered by such pumping.

"29. That defendant's said pumping in the Bessie street well and the lowering thereby of the head of artesian water in plaintiff's said well to more than fifty feet below the surface of the ground is an unreasonable and wrongful use of said Bessie street well; and by reason thereof plaintiff has been damaged two hundred and ninety dollars.

"30. That unless restrained by this court defendant threatens to and will continue to use its artesian wells in the city of Crookston, including said Bessie street well, in the future as in the past, and will impair the use of plaintiff's said artesian well as aforesaid, requiring a multiplicity of actions on the part of the plaintiff, and that he has not an adequate remedy at law in the premises.

"Conclusions of law.

"1. That plaintiff is entitled to judgment against the defendant that he have and recover from defendant the sum of two hundred and ninety dollars, besides his costs and disbursements herein.

"2. That the plaintiff is entitled to the judgment of this court that the defendant, its agents, officers, and employees, be enjoined and restrained from operating said Bessie street well so it will reduce the head of artesian water in plaintiff's said well more than fifty feet below the surface of the ground when plaintiff is not pumping or otherwise taking water from the same. In case it should hereafter appear that furnishing artesian water for household and domestic purposes and watering live stock kept in the city through a separate system of mains will reduce the head of water in plaintiff's well more than fifty feet below the surface of the ground, then the injunction should be modified to allow all artesian water required to be taken for such purposes by the defendant through such separate system of water mains."

Upon the former appeal, appellant attempted to justify its conduct under the law which it deemed applicable to percolating waters, as expounded in the leading English case of Chasemore v. Richards, 7 H. L. Cas. 349, followed in several American courts, viz., that with respect to underground waters which have not been proven to be flowing in a well-defined channel they belong to the owner of the soil, or, as stated by Chief Justice Tindal, in Acton v. Blundell, 12 Mees. & W. 324: "That principle, which gives to the owner of the soil all that lies beneath his surface; that the land immediately below is his property, whether it is solid rock, or porous ground, or venous earth, or part soil, part water; that the person who owns the surface may dig therein, and apply all that is there found to his own purposes at his free will and pleasure; and that if, in the exercise of such right, he intercepts or drains off the water collected from underground springs in his neighbor's well, this inconvenience to his neighbor falls within the description of damnum absque injuria, which cannot become the ground of an action."

In calling attention to the manifest injustice of a strict application of this rule to underground waters, Mr. Justice Jaggard (100 Minn. 481 [at p. 485] 111 N. W. 381, 8 L. R. A. [N. S.] 1250) referred to some of the English and many of the American authorities, and said: "A rigid rule, applying to underground waters the law applicable to surface waters in various jurisdictions, might work insufferable hard-

ship, and put the control of an element as necessary to life as air itself into the hands of a monopoly. * * * Arbitrary and artificial restrictions might readily make large areas uninhabitable save by an unnatural tribute to exclusive individual control. The American courts, taken as a whole, in recognition of such considerations, have viewed the matter from the point of view of public interests and of the natural use of natural advantages; that is to say, they have modified the supposedly absolute right of a man to use his own as he sees fit, under the maxim, 'Whose the soil is, his it is from the heavens to the depths of the earth,' by reference to the maxim of the civil law that 'One must use his own so as not to injure another.' "

Much confusion has arisen upon the subject from the fact that in attempting to apply the law of watercourses and navigable waters to underground waters, and not finding the analogy complete, several of the American courts have rejected it entirely, while others have limited the application to an unwarranted degree. A decision in this case does not call for a discussion of the legal principles applicable to percolating waters, strictly so called, and we reserve for the future, as occasion may arise, a consideration of that delicate and unsettled question. Percolating, as distinguished from artesian, waters, filter through the ground and collect in underground cavities, forming springs, or in what are commonly known as wells. The source of supply is limited, depending largely on the annual rainfall, and, if found in bodies of sand, gravel, or porous rock, such formations are not extensive. To waters of this character the English and many of the American courts have applied the rule of absolute ownership. The maxim "sic utere" has no place, and one owner may destroy his neighbor's well by digging deeper into the soil which holds the common supply.

Without admitting the justice or correctness of the law so applied even to percolating waters, we proceed with more confidence to a consideration of the proper rule which should govern the use of waters located in well defined strata. As to such waters the legal principles have become very well established. The difficulty generally exists in applying these principles to the facts of any given case. The decision on the former appeal was limited to the single question: Does the rule of correlative rights apply to the owners of land which contains a well-defined water basin, upon which source of supply all are

105 M.—13

dependent? But we now have before us an additional question, viz.: What is the proper application of the law to the facts as found? The trial court assumed that the law of the case was the rule of correlative rights; that is, that each of the parties to the action should be restricted to a reasonable use of the water, with due regard to the rights of the other, and undertook to apply it to the facts as found.

Having found that the great body of artesian water in the stratum one hundred seventy feet below the surface of the ground was inexhaustible and sufficient for all the purposes of all the parties concerned, and that it was the intention of appellant to pursue its plan of boring wells into such stratum until it secured enough water to meet the city's needs through its present water system and the necessary extensions thereof, and that in pursuing such plan the company had adopted the most approved system of pumps and the most economical method of pumping the water, nevertheless the court was of opinion that the plan of development and method of operation was unreasonable, because it reduced the head in respondent's well more than fifty feet below the surface and placed upon him the burden of providing a power pump to pump the water from the bottom of his well. The court was of opinion that, because it appeared from the evidence that fifty feet in depth was the limit practicable for hand pumping, respondent could not reasonably be required to go to the expense of taking the water from a lower point; that the evidence justified the conclusion that there was a practicable and reasonable method by which appellant could avoid reducing the head of respondent's well below the point of fifty feet, viz.: that it was not necessary to use artesian water for any other than domestic uses, such as household purposes, and watering stock, and that so far as water was required for sprinkling lawns, streets, flushing sewers, operating elevators, etc., it was feasible to lay an independent set of mains and pipes connecting directly with the river.

In applying the rule of law to the facts as found, the court directed that in no event, so long as appellant used its present system of single mains, should it so conduct its pumping operations as to reduce the head of respondent's well below the point of fifty feet. If in the future appellant should establish an independent system of mains for the use of river water for all purposes other than domestic,

then the injunction should be modified to permit appellant to use any amount of artesian water necessary to meet the domestic requirements of its patrons.

Appellant challenges the correctness of the court's conclusions of fact as well as of law, and submits that there is no evidence in the record which justified the court in finding it feasible or practicable to construct and maintain in the city of Crookston an independent and separate set of mains and connections for the purpose of furnishing river water for sprinkling, flushing sewers, extinguishing fires, etc. This finding goes to the merits of the question of reasonable use and the correlative rights of the parties, and we have read the record with the view of finding all of the evidence bearing on that point; but all we find is of a most general character. Mr. Peterson, superintendent and general manager of appellant company, testified that he did not consider a double system feasible because of the cost of maintaining the same, both to appellant and to the consumer, and that it would not be commercially practicable. There is no evidence to the contrary.

Whether such a scheme would be practicable and commercially advisable depends upon a great many questions with reference to which we find absolutely no evidence in the record. It would depend upon the cost of installing and maintaining such a double system. Would consumers patronize them both? If the rate was increased, in order to produce a fair return on the additional cost, would the city and the people respond and give the necessary financial return? The river water being unsuitable for domestic purposes, would it be safe and wise to extend the river system throughout the city, where the water would be obtainable by people who, from a sense of economy or necessity, might be tempted to use it for domestic purposes? These questions were not gone into at the trial, and we are of opinion that the learned trial judge was not justified in directing that appellant be restricted in its use of artesian water, as stated, unless it resort to the means stated of limiting its use to domestic purposes. If it is not feasible to install such a system, then appellant will be compelled to use its present system of mains and hydrants for all purposes, and must, from necessity, resort to the artesian reservoir to secure an adequate amount of pure water. If it is employing the most

approved and economical method to secure it, and as an incident to such method the head of respondent's well is reduced so that it becomes necessary to put in a power pump, then it follows that respondent, and others similarly situated, may reasonably be required to assume that burden.

In determining what is a reasonable use, we believe it proper to consider the necessities of all the inhabitants of Crookston. They have rights in the waters of the artesian basin coextensive with respondent and others having wells of their own. The question might be different were the waters collected by appellant and transported to a distance for the benefit of those having no connection with the immediate locality. In this respect the case differs from Katz v. Walkinshaw, 141 Cal. 116, 70 Pac. 663, 74 Pac. 766, 64 L. R. A. 236, 99 Am. St. 35, Forbell v. City, 164 N. Y. 522, 58 N. E. 664, 51 L. R. A. 695, 79 Am. St. 666, Barclay v. Abraham, 121 Iowa, 619, 96 N. W. 1080, 64 L. R. A. 255, 100 Am. St. 365, and Stillwater Water Co. v. Farmer, 89 Minn. 58, 93 N. W. 907, 60 L. R. A. 875, 99 Am. St. 541, leading cases on this subject and cited in the former opinion.

Appellant company was incorporated and has been maintained for the express purpose of furnishing the city of Crookston with a necessity which it would be difficult, if not impossible, for the residents to supply for themselves. Unquestionably, if a few hundred residents were to follow respondent's example and construct wells of their own, the effect would be to lower the head to a considerable extent, if not to the full extent accomplished by appellant. Indeed, there is evidence in the record to the effect that, even before appellant commenced to pump from the Bessie street well in 1905, a number of artesian wells within the city limits had already been reduced in head to the extent of from ten to eighteen feet. If, therefore, the residents of Crookston, acting individually, have the same rights as respondent with regard to this water, it must follow that appellant stands in the same relative position with respect to the use of the water for domestic purposes. It may be necessary to use a considerable portion of the artesian water for the purpose of flushing sewers, sprinkling streets, etc., if it shall prove inadvisable to install the river system; but even those purposes are of a public nature, for the good of the

community, including respondent, and all private well owners may reasonably be called upon to make some sacrifice in the interest of the common good of all.

We do not regard the use of the waters by appellant as an artificial use, which seems to have been the view taken in Willis v. City, 92 Iowa, 297, 60 N. W. 727, 26 L. R. A. 124. We believe, however, that a difference exists between the use of waters for strictly domestic purposes and for the other purposes mentioned, and that as to domestic uses both parties stand upon practically the same basis. But how far appellant may be permitted to go in using artesian water for other purposes will depend upon its ability to supply those needs from some other source. The application of the rule of correlative rights always depends upon the circumstances of each particular case. The courts need not be concerned if they fail to find an exact precedent, or are unable to apply all of the principles of the common law as applied to surface streams and bodies of water. Every legal principle is founded upon natural justice. While true that with underground waters there can be no upper or lower proprietors, no question of absolute ownership to the thread of the stream, the waters cannot be returned, no public rights are involved as to boating, fishing, etc., yet that just criterion of conduct which humanity insists upon is applicable here: "Sic utere tuo ut alienum non lædas."

The distinction between rights in surface and underground waters is not founded upon the fact of their location above or below the ground, but on the fact of knowledge with reference thereto. Collins v. Chartiers, 131 Pa. St. 143, 18 Atl. 1012, 6 L. R. A. 280, 17 Am. St. 791. Reasonable use is a question of fact, and if the rule is applicable to the use of a stream by an upper and lower proprietor, where both are dependent upon it as a motive power (Red River Roller Mills v. Wright, 30 Minn. 249, 15 N. W. 167, 44 Am. 194), it is applicable here, where all the people of the city of Crookston are dependent upon a common source of supply of water for domestic purposes. If the rule may be invoked to prevent the pollution of a stream or lake upon the surface, it will prevent appellant in this case from drawing on the supply and contaminating it with polluted river water; and if the rule may be called into exercise to prevent appellant from negligently and unnecessarily interfering with respond-

ent's natural rights, it will likewise require respondent to suffer a reasonable inconvenience for the common good of others equally dependent upon the same gift of nature.

The proper solution of these questions upon another trial will call for a careful consideration by the learned trial court of the facts and legal principles involved. It would seem that the subject was still in the experimental stage, and that it may require some time to properly test the capacity of the water strata and demonstrate to what extent the general supply and the convenience of private well owners will be affected by the company's plans. During such period it is possible that the differences of the parties may be satisfactorily adjusted by a modified injunctional order, as suggested by appellant.

As the case is presented upon this record, a new trial is unavoidable for the reasons stated; and, inasmuch as new or different facts may be then developed, any attempt at this time to state how the law should be applied upon a given state of facts would tend to confuse, rather than assist.

Reversed. .